# EXHIBIT A

Filed
File Date: 11/1/2022 4:59 PM
Hillsborough Superior Court Northern District
E-Filed Document

STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                               SUPERIOR COURT
NORTHERN DISTRICT                              *JURY TRIAL DEMANDED*
                        Docket No._____
                        216-2022-CV-00728

PC Connection, Inc., d/b/a Connection

v.

Peter Sillich

## VERIFIED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

Plaintiff PC Connection, Inc. d/b/a Connection ("Connection" or the "Company") brings this Complaint for preliminary and permanent injunctive relief and damages against Defendant Peter Sillich.

## I.      INTRODUCTION

1.      This action arises from ongoing and willful violations by Mr. Sillich, a former Connection employee, of the non-competition and non-solicitation covenants in Mr. Sillich's employment agreement (the "Agreement") with the Company.  Connection brings this action as a last resort, after Mr. Sillich has twice ignored the Company's warning notices, and continues to violate the Agreement by soliciting – on behalf of one of Connection's direct competitors – customers that were specifically assigned to him when he worked for the Company.

2.      For two years starting in August 2020, Mr. Sillich was employed by Connection as an Account Manager in the Company's small/medium size business division (hereinafter the "SMB Division").  In this role, Mr. Sillich was assigned responsibility for managing the Company's relationships with specified accounts, which included some of the SMB Division's most important customers.  Mr. Sillich's duties as an Account Manager included working with manufacturers and vendors that partner with Connection, to obtain pricing for Sillich's assigned

1

accounts for the purchase of IT equipment and services.  As a result, Mr. Sillich obtained highly sensitive and confidential customer pricing and purchasing information which could easily be used by Connection's competitors to compete unfairly with the Company.

3.     Mr. Sillich's employment with Connection ended on or about July 28, 2022.  As of that time, Mr. Sillich was managing approximately 130 customer accounts that had been assigned to him.

4.     Several weeks later, Connection learned that Mr. Sillich had contacted one of the Company's manufacturing partners, Hewlett Packard Enterprise ("HPE"), and attempted to convince HPE to prepare a pricing proposal that he could present to one of Sillich's former Connection accounts. REDACTED  Sillich had specifically inquired if HPE could provide him with a price quote that reflected a special pricing arrangement that HPE provided to Connection for Fullerton Tool, but that was not available to Sillich's current employer.   As a result, on September 1, 2022, Connection's counsel sent Mr. Sillich a letter reminding him of his obligation to comply with the non-competition/non-solicitation covenants in the Agreement.  In response, Mr. Sillich claimed he was "currently unemployed," denied having solicited any of his assigned accounts, and stated "I agree to comply with the non compete, non solicit."

5.     Several weeks later, Connection learned that Mr. Sillich was employed as an account manager by one of the Company's direct competitors, Partner One IT, and was contacting his former Connection accounts to urge them to shift their business from Connection to Partner One.  As a result, on September 28, 2022, Connection sent a second warning letter to Mr. Sillich.  This time when Mr. Sillich responded, he alleged that he is "under no obligation with Connection."  Connection has learned of multiple instances since September 28 when Mr. Sillich solicited his former Connection accounts.  In doing so, Sillich is exploiting, for the benefit

of Connection's direct competitors, the confidential information, customer relationships, and customer goodwill that he developed while working for the Company.

6.     Connection now seeks an injunction to prevent Mr. Sillich from soliciting the accounts assigned to him when he worked for the Company, or from otherwise competing with the Company for sales to these accounts.  This relief is narrowly tailored and does not impose an undue burden on Sillich's ability to work in this field.  Connection also seeks to recover any identifiable damages caused by this conduct.

## II.     PARTIES

7.     Plaintiff PC Connection, Inc. d/b/a Connection is a Delaware corporation with a principal place of business at 730 Milford Rd, Merrimack, New Hampshire 03054.

8.     Defendant Peter Sillich is natural person who, upon information and belief, resides at 119 Beckley Drive, Greer, South Carolina 29650.

## III.     JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this matter pursuant to RSA 491:7.

10.     This Court has personal jurisdiction over Mr. Sillich.  In executing the Agreement, Sillich consented and submitted to the exclusive jurisdiction of the federal and state courts in New Hampshire in the event of an alleged breach of the Agreement.

## IV.     FACTUAL BACKGROUND

11.     Connection, a publicly traded company, is a value added reseller of specialized IT products and services.  Connection partners with over 1,600 suppliers to offer more than 425,000 products to business customers throughout the country.

12.     Connection has three operating divisions, each serving distinct markets.  The SMB Division serves small and medium sized businesses throughout the United States.

3

13.     The IT hardware and software sales industry is highly competitive.  Many other resellers compete with Connection for customers and business, including companies such as CDW and Partner One IT.

14.     Connection's business depends on the Company's ability to establish and maintain strong relationships with customers that provide a source for repeat business. Connection's Account Managers play a critical role in this process.   The customer relationships that Account Managers are able develop with key points of contact with the Company's customers, and the goodwill that inures from those relationships, is critical to Connection's success and ability to effectively compete with its competitors.

15.     Also critical to Connection's success is the Company's ability to protect the confidentiality of highly sensitive client information that Account Managers, like Mr. Sillich, obtain during the course of their employment.  This includes, for example, information concerning the products and services that Connection currently is supplying to its customers, and information concerning the pricing Connection was able to obtain from manufacturers and vendors for those products and services.  Armed with this information, another reseller could easily, and unfairly, undercut that pricing and threaten Connection's relationship with its clients.

**A.**     **Sillich's Employment Agreement With Connection**

16.     Mr. Sillich was hired by Connection in August 2020.  He remained with the Company for two years.

17.     On August 3, 2020, prior to the start of his employment with Connection, Mr. Sillich signed the Company's Employment Agreement (see copy attached as **Exhibit A**).  In signing the Agreement, Mr. Sillich acknowledged that Connection "is engaged in a highly

competitive business" and that "its success in the marketplace depends upon the preservation of its confidential information and industry reputation."

18.     The Agreement is tailored to address the competitive challenges and confidentiality issues that Connection faces in the IT hardware and software sales industry.

19.     First, the Agreement contains a non-disclosure covenant that bars the disclosure of Connection's "Confidential Information," defined to include, among other things, information concerning the company's marketing and strategic plans, customer needs, and costs and pricing. See Agreement ¶ 2.  During all relevant times, Connection's Confidential Information was not generally known to the public.  Connection employs non-disclosure covenants along with other measures to protect its Confidential Information from becoming available to persons other than those selected by Connection to have access to it.

20.     Second, the Agreement contains a non-solicitation covenant that bars Mr. Sillich, during a restricted period of 18 months following the termination of his employment (the "Restricted Period"), from directly or indirectly soliciting any Connection customer or prospective customer as to which Sillich, during his employment with Connection, performed work, had other than incidental contact, or had access to confidential information.  *Id*. at ¶ 4.3 Under the Agreement, the Restricted Period is tolled during any period of time that Sillich is in violation of the Agreement's terms. *Id*. ¶ 4.6

21.     In signing the Agreement, Mr. Sillich expressly acknowledged that:

   a.   The goodwill he developed during his employment with customers and
        prospective customers "shall be the sole, exclusive and permanent property of
        the Company."  *Id.* ¶ 4.2;

b.  The restrictive covenants in the Agreement are "necessary for the reasonable and proper protection of the goodwill, Confidential Information and other legitimate interests of" Connection.  *Id.* ¶ 4.6;

c.  Any breach of the covenants would subject Connection to irreparable harm. *Id.*; and

d.  In the event of a breach or threatened breach Connection would have the right to obtain preliminary and permanent injunctive relief without having to post a bond, and would be entitled to an award of attorney's fees incurred to secure such relief.  *Id*.

**B.  Sillich's Work For Connection**

22.  With Connection, Mr. Sillich worked in the SMB Division as an Account Manager.  In this capacity, specific customer accounts were assigned Sillich.

23.  As of July 28, 2022, when Sillich's employment with Connection ended, approximately 130 accounts had been assigned to him (the "Assigned Accounts").

24.  As an Account Manager, Mr. Sillich had regular, direct contact with representatives and decision-makers for the Assigned Accounts, in order to identify the customers' IT needs and develop solutions to meet the same.

25.  One of Mr. Sillich's principal roles as an Account Manager was to work with manufacturers and vendors that partner with Connection (such as HPE), to negotiate optimum pricing for IT equipment and services purchased by the Assigned Accounts.  As a result, Mr. Sillich received highly confidential information concerning the Assigned Accounts' purchasing histories and the prices the Accounts were paying for IT equipment and services.

C.     **Sillich's Work for Partner One**

26.     Connection terminated Mr. Sillich's employment on or about July 28, 2022.  This occurred after Mr. Sillich violated the Company's code of conduct policies.

27.     Several weeks after Mr. Sillich's termination, an HPE representative, Becky Brown, informed Connection that Mr. Sillich had contacted her via Linked-In and attempted to convince her to prepare a pricing proposal for REDACTED which was one of the Assigned Accounts.  Ms. Brown reported that Mr. Sillich had inquired if HPE could provide him with a price quote that reflected a special pricing arrangement that HPE provided to Connection for REDACTED but that was not available to Sillich's current employer.

28.     By letter dated September 1, 2022, Connection's counsel reminded Mr. Sillich of his continuing obligations under the Agreement and requested written confirmation that he would not solicit customers assigned to him during his employment with the Company.  See **Exhibit B** (9/1/22 letter to Sillich).

29.     Mr. Sillich responded on September 7, 2022, through an email sent to Connection's counsel in which he alleged he was "currently unemployed."  As to his contact with REDACTED  Mr. Sillich denied any wrongdoing.  He alleged that the customer had reached out to him first, and that he had replied by telling the customer, "I am currently not working and couldn't be of any help."   Mr. Sillich further alleged that since leaving Connection, "I have not reached out to any of my old customers," and he concluded the email by stating: "I agree to comply with the non compete, non solicit."  See **Exhibit C** (9/7/22 email from Sillich).

30.     However, just a few weeks later, Connection learned that Mr. Sillich was not unemployed, but had joined Partner One and was soliciting Assigned Accounts on behalf of that company.  Connection obtained this information from customer representatives who contacted

the Company after they were solicited by Mr. Sillich.  In addition, on multiple occasions, Connection received email that apparently were misdirected to Mr. Sillich's Connection email address (Peter.Sillich@connection.com) rather than his Partner One email address (psillich@partneroneit.com), and that described Mr. Sillich's efforts to solicit Connection's customers on behalf of Partner One.  These documents show that Sillich began using his Partner One email no later than September 15, 2022.

31.     Based on this new information, on September 28, 2022, Connection's counsel sent Mr. Sillich a second letter demanding that he cease violating the non-competition and non-solicitation covenants in the Agreement.  See **Exhibit D** (9/28/22 letter to Sillich).  Connection's counsel also sent a separate letter to Partner One, in which it informed Partner One of Mr. Sillich's ongoing contractual obligations to Connection.  See **Exhibit E** (9/28/22 letter to Partner One).

32.     Partner One did not respond to Connection's letter.  However, Mr. Sillich responded to Connection's letter to him by email dated September 28, 2022.  In contrast to his earlier representation that he agreed "to comply with the non compete, non solicit," Mr. Sillich proclaimed in the September 28 email: "I am under no obligation to Connection."  In addition, apparently unaware of Connection's receipt of email that Mr. Sillich sent on Partner One's behalf starting as early as September 15, 2022 (using his Partner One email address), Sillich alleged, falsely, that he "started with Partner One just last week 09/22/2022." See **Exhibit F** (9/28/22 email from Sillich).

33.     Since September 28, 2022, Mr. Sillich has continued to solicit on behalf of Partner One both Assigned Accounts, and other SMB Division clients that Sillich worked with while at Connection.

34.     For example, on or about October 11, 2022, **REDACTED**, a representative for **REDACTED**, a software manufacturer that is a Connection partner, informed Connection that Mr. Sillich recently asked **REDACTED** to provide a price quote that Partner One could present to **REDACTED**. **REDACTED** is a current Connection customer and was the second largest of the Assigned Accounts, generating $**REDACTED** in sales in the 12 month period prior to Mr. Sillich's termination.  Mr. Sillich acknowledged to Mr. **REDACTED** that **REDACTED** already had provided Connection with preferred pricing for **REDACTED**, and he asked **REDACTED** to transfer that preferred pricing arrangement from Connection to Partner One.

35.     On October 15, 2022, Margaret Murphy, a Senior Sales Manager in the SMB Division, spoke directly with **REDACTED** CFO, **REDACTED**.  Mr. **REDACTED** advised that Mr. Sillich had contacted **REDACTED** CIO, **REDACTED**, and urged Mr. **REDACTED** to transfer **REDACTED** business from Connection to Partner One.

36.     In addition, also on October 11, 2022, a representative for another of the Assigned Accounts, **REDACTED** sent an email to Mr. Sillich's Connection email address to request that they reschedule a meeting that apparently had been scheduled for that day to discuss the purchase of Adobe VIP software.

37.     All told, based on reports that customers have made to Connection and email that were misdirected to Mr. Sillich's Connection email address, Connection is aware of Mr. Sillich having solicited at least seven Connection customers since leaving the Company, namely:

- **REDACTED**
- 
- 
-

- 
-
-

### CAUSES OF ACTION

### COUNT I
### Declaratory Relief

38.     Connection repeats the allegations of the above paragraphs as if fully set forth herein.

39.     The Agreement, including the restrictive covenants contained therein, is a valid and enforceable contract.

40.     Mr. Sillich has breached, and continues to breach, the non-solicitation and non-compete covenants in the Agreement by soliciting, on behalf of Partner One, Connection customers that were assigned to Sillich and that he called upon and solicited business from during his employment with the Company.

41.     Because Mr. Sillich breached the Agreement, the Restricted Period has been tolled during the period of said breach.

42.     Connection respectfully requests that this Court issue a declaratory judgment that Mr. Sillich has breached the Agreement, specifically the non-solicitation and non-competition covenants in the Agreement; that the Restricted Period is extended by the period of time of said breach; and that Connection is entitled to recover the costs and attorney's fees incurred to enforce the Agreement.

## COUNT II
### Preliminary and Permanent Injunctive Relief

43.     Connection repeats the allegations of the above paragraphs as if fully set forth herein.

44.     The Agreement, including the restrictive covenants contained therein, is a valid and enforceable contract.

45.     Mr. Sillich has breached, and continues to breach, the non-solicitation covenant in the Agreement by soliciting Connection customers that were assigned to Sillich during his employment with Connection.

46.     Mr. Sillich also has breached, and continues to breach, the non-competition covenant in the Agreement by competing with Connection in the sale of IT products and services to Connection customers.

47.     By signing the Agreement, Mr. Sillich acknowledged that Connection would be irreparably harmed by a breach of the non-competition and non-solicitation covenants in the Agreement, such that the Company would have the right to obtain preliminary and permanent injunction relief against any further such breach.

48.     Connection has been and/or will be irreparably harmed unless Mr. Sillich is enjoined from breaching his contractual obligations under the Agreement.

49.     Connection cannot be fully or adequately compensated through monetary damages for the irreparable harm Connection has suffered or will suffer as a result of Mr. Sillich's breach of the Agreement.

50.     Entering an injunction to prevent Mr. Sillich from soliciting the Assigned Accounts and other Connection accounts that he worked with or obtained confidential information about during his employment with the Company, or from competing with

11

Connection for sales to those accounts, would not impose an undue burden on Mr. Sillich, is necessary for the protection of Connection's legitimate interests, and would not be injurious to the public interest.

## COUNT III
### Breach of Contract

51.     Connection repeats the allegation of the above paragraphs as if fully stated herein.

52.     The Agreement, including the restrictive covenants contained therein, is a valid and enforceable contract.

53.     Connection performed all of its contractual obligations and has satisfied all conditions precedent to its ability to exercise its rights under the Agreement.

54.     Mr. Sillich has breached the Agreement by soliciting Connection customers on behalf of Partner One.

55.     Connection is entitled to recover damages arising out of Sillich's breach to the extent such damages are ascertainable.

## PRAYER FOR RELIEF

WHEREFORE, Connection respectfully requests that this Honorable Court:

A.     Conduct a hearing as soon as practicable on Connection's entitlement to preliminary injunctive relief;

B.     Enter a preliminary injunction enjoining Mr. Sillich from engaging in any further conduct in violation of the Agreement;

C.     Declare that Mr. Sillich violated the Agreement;

D.     Establish the damages to which Connection is entitled as a result of Sillich's conduct;

E.      Award Connection recovery of the attorney's fees and costs incurred in bringing this action; and

F.      Grant such further and other relief as this Court deems just and proper.

Respectfully submitted,

PC CONNECTION, INC.,
D/B/A CONNECTION

By its attorneys,

Dated: November 1, 2022          _/s/ Christopher H.M. Carter_____
                                 Christopher H.M. Carter, Esq. (#12452)
                                 Owen R. Graham, Esq. (#266701)
                                 Hinckley, Allen & Snyder LLP
                                 650 Elm Street, Suite 500
                                 Manchester, NH 03101
                                 Tel: (603) 225-4334
                                 ccarter@hinckleyallen.com
                                 ograham@hinckleyallen.com

## **VERIFICATION**

I, Margaret Murphy, of PC Connection, Inc., d/b/a Connection, certify that I have read the above Verified Complaint and that the allegations therein are true to the best of my knowledge, information and belief.

Date: November 1, 2022

*Margaret N. Murphy*

STATE OF NEW HAMPSHIRE
COUNTY OF HILLSBOROUGH

Personally appeared before me, the above-named Margaret Murphy who made oath that the above statements are true to the best of her knowledge and belief.

Date: November 1, 2022

*Ann Christmas*
Justice of the Peace/Notary Public
My commission expires: *October 4, 2027*

#63120605

14

# EXHIBIT A

## EMPLOYEE AGREEMENT

I, the undersigned, acknowledge the importance to PC Connection, Inc. d/b/a Connection, and each of the Connection family of companies, existing now or in the future (hereinafter referred to collectively as "Connection" or the "Company") of protecting its confidential information and other legitimate business interests, including without limitation the valuable trade secrets and good will that it has developed or acquired.  I also acknowledge that Connection is engaged in a highly competitive business, that its success in the marketplace depends upon the preservation of its confidential information and industry reputation, and that the Company's practice of obtaining agreements such as this one from its employees is both known to me and reasonable.  Therefore, in consideration of my initial and/or ongoing employment with the Company, in consideration of my being granted access to trade secrets and other confidential information of the Company, and for other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge:

1.  **Loyalty and Conflicts of Interest**

    1.1   <u>Exclusive Duty</u>.  I agree that, during my employment, I will devote my full working time and my best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of Connection and to the discharge of my duties and responsibilities on its behalf.  I further agree not to engage in any other business activity or serve in any industry, trade, professional, governmental or academic position during my employment with the Company, unless I have first received the express written approval of a duly authorized officer of the Company.

    1.2   <u>Compliance with Company Policy</u>.  I agree to comply with all policies, practices and procedures of Connection, as these may be implemented and/or changed by the Company from time to time.  Without limiting the generality of the foregoing, I acknowledge that Connection may from time to time have agreements with other Persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding Intellectual Property, as defined below, created during the course of work under such agreements and/or regarding the confidential nature of such work.  I agree that I will comply with and be bound by all such obligations and restrictions which the Company conveys to me, and that I will take all actions necessary to discharge the obligations of the Company under such agreements.

2.  **Confidentiality**

    2.1   <u>Nondisclosure and Nonuse of Confidential Information</u>.  I agree that all Confidential Information, as defined below, which I create or to which I have access as a result of my employment and other associations with the Company is and shall remain the sole and exclusive property of Connection.  I agree that, except as required for the proper performance of my regular duties for the Company, as expressly authorized in writing in advance by the Company, or as required by applicable law, I will never, directly or indirectly, use or disclose any

Confidential Information.  I understand and agree that this restriction shall continue to apply after the termination of my employment or this Agreement, howsoever caused.  Further, I agree to furnish prompt notice to Connection of any required disclosure of Confidential Information sought pursuant to subpoena, court order or any other legal process or requirement, and agree to provide the Company a reasonable opportunity to seek protection of the Confidential Information prior to any such disclosure.

2.2    <u>Use and Return of Documents</u>.  I agree that all documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of Connection and any copies (including without limitation electronic), in whole or in part, thereof (the "Documents" and each individually, a "Document"), whether or not prepared by me, shall be the sole and exclusive property of the Company.  Except as required for the proper performance of my regular duties for Connection or as expressly authorized in writing in advance by the Company, I will not copy any Documents or remove any Documents or copies or derivatives thereof from the premises of the Company.  I will safeguard, and return to the Company immediately upon termination of my employment, and/or at such other times as may be specified by the Company, all Documents and other property of the Company, and all documents, records and files of its customers, subcontractors, vendors and suppliers ("Third-Party Documents" and each individually a "Third-Party Document"), as well as all other property of such customers, subcontractors, vendors and suppliers, then in my possession or control.  Provided, however, if a Document or Third-Party Document is on electronic media, I may, in lieu of surrender of the Document or Third-Party Document, provide a copy on electronic media (*e.g.*, a properly formatted diskette) to the Company and delete and overwrite all other electronic media copies thereof. I further agree that, upon request of any duly authorized officer of Connection, I will disclose all passwords necessary or desirable to enable the Company to obtain access to the Documents and Third-Party Documents.

2.3    <u>Defend Trade Secrets Act of 2016</u>.  Under the federal Defend Trade Secrets Act of 2016, I understand that I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that:  (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to my attorney in relation to a lawsuit for retaliation against me for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

3.    **Intellectual Property and Inventions**

3.1    <u>Ownership and Licensing</u>.  I shall maintain accurate and complete contemporaneous records of, and shall immediately and fully disclose and deliver to Connection, all Intellectual Property, as defined below.  I have attached hereto as <u>Exhibit A</u> a list describing all inventions, original works of authorship,

developments, improvements, and trade secrets which were made by me prior or otherwise unrelated to my employment with the Company, which belong to me and which are not assigned to the Company hereunder (collectively referred to as "Prior Inventions"); and, if no such list is attached, I represent and warrant that there are no such Prior Inventions. If, in the course of my employment with the Company, I incorporate into any of the Intellectual Property any Prior Inventions or any other invention, improvement, development, concept, discovery or other proprietary information owned by me or in which I have an interest (collectively, including Prior Inventions, "Employee Inventions"), I hereby grant Connection an irrevocable, worldwide, fully paid-up, royalty-free, non-exclusive license, with the right to sublicense through multiple tiers, to make, use, sell, improve, reproduce, distribute, perform, display, transmit, manipulate in any manner, create derivative works based upon, and otherwise exploit or utilize in any manner the Intellectual Property. All copyrightable works that I create, including without limitation computer programs and documentation, shall be considered "works made for hire" and shall, upon creation, be owned exclusively by Connection.

3.2     <u>Assignment of Rights</u>. I hereby assign and agree in the future to assign to Connection (or as otherwise directed by the Company) my full right, title and interest in and to all Intellectual Property. I further agree to waive and hereby do waive all claims to moral and other rights I may have in any Intellectual Property. I agree to provide, at the Company's request, all further cooperation which the Company determines is necessary or desirable to accomplish the complete transfer of the Intellectual Property and all associated rights to the Company, its successors, assigns and nominees, and to ensure the Company the full enjoyment of the Intellectual Property, including without limitation executing further applications (both domestic and foreign), specifications, oaths, assignments, consents, releases, government communications and other commercially reasonable documentation, responding to corporate diligence inquiries, and providing good faith testimony by affidavit, declaration, and/or deposition, in-person or by other proper means, in support of any effort by the Company to establish, perfect, defend, or otherwise enjoy, in this or any foreign country, its rights acquired pursuant to this Agreement through prosecution of governmental filings, regulatory proceedings, litigation or other means.

To the extent I cannot transfer and assign my entire right, title, and interest to the Intellectual Property, or any portion thereof, then I will assign and transfer all right, title, and interest in and to the Intellectual Property to Connection at the first opportunity to do so. To the extent that I cannot assign and transfer any of my full right, title, and interest in the Intellectual Property, then I hereby grant the Company an irrevocable, worldwide, fully paid-up, royalty-free, exclusive license, with the right to sublicense through multiple tiers, to make, use, sell, improve, reproduce, distribute, perform, display, transmit, manipulate in any manner, create derivative works based upon, and otherwise exploit or utilize in any manner the Intellectual Property. If Connection is unable because of my mental or physical incapacity or for any other reason to secure my signature for any of the assignments, licenses, or other reasonably requested documents

pertaining to the Intellectual Property referenced in Paragraph 3 hereof within ten days of the delivery of said documents to me, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file said documents and to do all other lawfully permitted acts to further the perfection, defense, and enjoyment of the Company's rights relating to the Intellectual Property with the same legal force and effect as if executed by me. I stipulate and agree that such appointment is a right coupled with an interest, and will survive my incapacity or unavailability at any future time.

I understand and agree that to the extent this Agreement shall be construed in accordance with the laws of any state which precludes a requirement in an agreement such as this to assign to an employer certain classes of inventions developed by an employee, this Paragraph 2(b) shall be interpreted to exclude any invention which a court of competent jurisdiction determines to fall within such classes.

3.3   <u>Delivery of Intellectual Property-Related Information</u>.  I agree that I will assign, deliver and communicate to Connection, its representatives or agents, and its successors and assigns, any know-how, facts and materials arising from or relating to Intellectual Property, including without limitation: (i) all simulations, prototypes, and other embodiments of the Intellectual Property; (ii) all drawings, blueprints, calculations, research plans and results, lab notes, workbooks, software and other records and written materials that relate to the Intellectual Property or that embody or record any know-how pertaining to the Intellectual Property; (iii) all files, documents and communications pertaining to the Intellectual Property; and (iv) evidence for patent interference purposes or for other legal proceedings whenever requested.  I will not charge the Company, its successors or assigns for time spent in complying with my obligations under Paragraphs 3 of this Agreement.

3.4   <u>Original Work</u>.  I hereby represent and warrant that all of the product resulting from my work for the Company will be original and will not infringe the rights of any third party, including without limitation intellectual property rights, such as rights pertaining to patents, trademarks, copyrights and trade secrets.  I further represent that I have not taken, copied or otherwise shared with Connection any confidential or proprietary documents or other material belonging to any former employer or other third party; and I covenant that I will at no time during the course of my employment with the Company use or disclose any confidential or proprietary information belonging to any third party without that party's express consent.

3.5   <u>Waiver and Indemnification</u>.  I agree that I will not, and will not permit anyone acting on my behalf to, assert against the Company, its directors, shareholders, officers, managers, members, joint venturers, employees, representatives or agents (collectively, with the Company, the "Corporate Group") any cause of action, right or claim, of any kind or nature, with respect to the Intellectual

Property or any Employee Inventions, including without limitation Employee Inventions incorporated into the Intellectual Property, and I agree to indemnify and hold harmless the Corporate Group, and each of them, from any and all causes of action, rights or claims, of any kind or nature, losses, damages, costs and expenses, including without limitation attorneys' fees, and any and all other liabilities incurred by any of the Corporate Group arising from or relating to proprietary rights in the Employee Inventions, or any of them, or resulting from my failure to meet any of my obligations under Paragraph 3 of this Agreement.

4.   **Non-Competition and Other Restricted Activity**

4.1   <u>Non-Competition</u>. I agree that the Non-Solicitation and Nondisclosure restrictions in this Agreement will not sufficiently protect the Company's business interests, including but not limited to its trades secrets, confidential information, and good will. Accordingly, I agree that, during my employment and during the 18-month period immediately following the termination of my employment for any reason (the "restricted period"), I will not, directly or indirectly, compete, or undertake any planning to compete, with Connection, whether as an owner, partner, investor, consultant, employee or otherwise. Specifically, but without limiting the foregoing, I agree not to work or provide services, in any capacity, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Person who is engaged in any business that is competitive with the business of the Company, as conducted or in planning during my employment. A competitive business shall, without express or implied limitation, include any Person engaged in the sales, marketing, and/or service of information technology products, computers, and computer networking hardware, software, peripherals and related services (both remote and on-site) through any means, including without express or implied limitation field sales and telephonic and electronic commerce, provided the Person is engaged in such competitive business in one or more of the same geographic territories served by Connection. I further agree, during the restricted period, not to be employed or otherwise engaged by a client or customer of the Company and provide for such client or customer the same or similar technical, computer support or other services which I provided to such client or customer while employed by the Company. I also agree, during the restricted period, not to be employed or otherwise engaged by a supplier, vendor or business partner of the Company, if such supplier, vendor or business partner competes with the Company regarding the sales, marketing, and service of information technology products, computers, and computer networking hardware, software, peripherals and related services to any customer or prospective customer. I understand that the foregoing shall not prevent my passive ownership of one percent (1%) or less of the equity securities of any publicly traded company.

4.2   <u>Good Will</u>. I acknowledge and agree that any and all good will which I develop during my employment with any of the customers, prospective customers, subcontractors or suppliers of Connection shall be the sole, exclusive and

permanent property of the Company, and shall continue to be such after the termination of my employment, howsoever caused.

4.3   <u>Non-Solicitation of Customers</u>.  I agree that, during my employment and during the 18-month period immediately following the termination of my employment for any reason, I will not, directly or indirectly, (a) solicit, encourage or induce any customer of Connection to terminate or diminish its business relationship or patronage with the Company; (b) seek to persuade or induce any such customer or prospective customer of Connection to conduct with anyone else any business or activity which such customer or prospective customer conducts or could conduct with the Company; or (c) accept business from any such customer.  Provided, these restrictions shall apply (y) only with respect to those Persons who are or have been a customer of Connection at any time within the immediately preceding one-year period or whose business has been solicited on behalf of the Company by any of its officers, employees or agents within said one-year period, other than by form letter, blanket mailing or published advertisement, and (z) only if I have performed work for such Person during my employment with the Company or have been introduced to, or otherwise had non-incidental contact with, such Person as a result of my employment or other associations with the Company or have had access to Confidential Information which would assist in the solicitation of such Person.

4.4   <u>Non-Solicitation/Non-Hiring of Employees and Independent Contractors</u>.  I agree that, during my employment and for the 18-month period immediately following the termination of my employment for any reason, I will not, and will not directly or indirectly assist anyone else to, (a) hire or solicit for hiring any employee of the Company or seek to persuade or induce any employee of the Company to discontinue employment with the Company, or (b) hire or engage any independent contractor providing services to the Company, or solicit, encourage or induce any independent contractor providing services to the Company to terminate or diminish its business relationship with the Company.  For the purposes of this Agreement, an "employee" or "independent contractor" of Connection is any person who is or was such at any time within the preceding six-month period.

4.5   <u>Notice of New Address and Employment</u>.  During the 18-month period immediately following the termination of my employment for any reason, I will notify Connection in writing of any change in my address and of each new job or other business activity in which I plan to engage at least two weeks prior to beginning such job or activity.  Such notice shall state the name and address of any new employer and the nature of my position.  I further agree to provide Connection with any other pertinent information concerning such business activity as the Company may reasonably request in order to determine my continued compliance with my obligations under this Agreement.  I agree to notify my new employer(s) of my obligations under this Agreement, and hereby consent to notification by the Company to my new employer(s) concerning my obligations under this Agreement.

31405286_2 CONNECTION Non-MA or CA  10.2018

4.6    <u>Acknowledgement of Reasonableness; Remedies</u>.  In signing this Agreement, I give the Company assurance that I have carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed on me under this Agreement.  I agree without reservation that each of the restraints contained herein is necessary for the reasonable and proper protection of the good will, Confidential Information and other legitimate business interests of Connection, that each and every one of those restraints is reasonable in respect to subject matter, length of time and geographic area; and that these restraints will not prevent me from obtaining other suitable employment during the period in which I am bound by them.  I agree that I will never assert, or permit to be asserted on my behalf, in any forum, any position contrary to the foregoing.  I also acknowledge and agree that, were I to breach any of the provisions of this Agreement, the harm to the Company would be irreparable.  I therefore agree that, in the event of such a breach or threatened breach, the Company shall, in addition to any other remedies available to it, have the right to obtain preliminary and permanent injunctive relief against any such breach or threatened breach without having to post bond, and will additionally be entitled to an award of attorney's fees incurred in connection with securing any relief hereunder.  Without limiting the generality of the foregoing, I agree that, in the event of my breach of any of the provisions of this Agreement, the Company shall have the immediate right to terminate any shares of restricted stock and stock options that have been awarded to me by the Company, notwithstanding anything to the contrary in any applicable grant document, stock option plan, and any other applicable agreements and plans.  I further agree that, in the event that any provision of this Agreement shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.  Finally, I agree that the periods of restriction set forth in Paragraph 4 of this Agreement shall be tolled, and shall not run, during any period of time in which I am in violation of the terms thereof, in order that the Company shall have all of the agreed-upon temporal protection recited herein.

4.7    <u>Consent to Jurisdiction</u>.  The parties agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the state or federal courts in the State of New Hampshire, and I voluntarily submit to the exclusive jurisdiction over my person by a court of competent jurisdiction located within the State of New Hampshire.   The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the State of New Hampshire, and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum.  This Agreement is intended to supplement, and not supersede, any remedies or claims that may be available to the Company under applicable law, including any claims asserting misappropriation of trade secrets or unfair trade practices.  I agree to accept service of process by registered or certified mail or the equivalent directed

to my last known address on the books of the Company, or by whatever other means are permitted by such court.

5.    **Exit Interview**

I agree that, at the time my employment ends, I will participate in an exit interview conducted by a designated representative of Connection, and that I will otherwise cooperate with the Company to assure a smooth transition of my duties and responsibilities. If requested to do so by the Company, either during or after my employment with the Company, I agree to sign a termination certificate in the form attached hereto as Exhibit B, in which I confirm that I have complied with the requirements of this Agreement and that I am aware that certain restrictions imposed upon me by this Agreement continue after the termination of my employment. I understand, however, that my rights and obligations under this Agreement will continue even if I do not sign a termination certificate.

6.    **Definitions**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings provided in this paragraph and as provided elsewhere in this Agreement. For purposes of this Agreement, the following definitions apply:

"Confidential Information" means any and all information of Connection, whether or not in writing, that is not generally known by others with whom the Company competes or does business, or with whom it plans to compete or do business, and any and all information, which, if disclosed, would assist in competition against the Company, including but not limited to (a) all proprietary information of the Company, including but not limited to the existing and future products and services, technical data, methods, processes, know-how, developments, inventions, and formulae of the Company, (b) the development, research, testing, marketing and financial activities and strategic plans of the Company, (c) the manner in which the Company operates, including information about the experience and quality of its employees and contractors, (d) its costs and sources of supply, (e) the identity and special needs of the customers, prospective customers and subcontractors of the Company, and (f) the people and organizations with whom the Company has business relationships and the substance of those relationships. Without limiting the generality of the foregoing, Confidential Information shall specifically include: (i) any and all product testing methodologies, product test results, research and development plans and initiatives, marketing research, plans and analyses, strategic business plans and budgets, short and long-range product, sales, marketing, expansion, diversification and similar plans; (ii) any and all vendor, supplier and purchase records, including without limitation the identity of contacts at any vendor, any list of vendors or suppliers, any oral or written agreements, any lists of purchase transactions and/or prices paid; and (iii) any and all customer lists and customer and sales records, including without limitation the identity of contacts at purchasers, any list of purchasers, and any list of sales transactions and/or prices charged by the Company. Confidential Information also includes any information that the Company may receive or

has received from customers, subcontractors, suppliers or others, with any understanding, express or implied, that the information would not be disclosed.

"Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable, copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by me (whether alone or with others, and whether or not during normal business hours or on or off Company premises) during the period of my employment that relate in any way to the business or products of the Company, or to any prospective activity of the Company, or which make use of the Confidential Information or of facilities or equipment of Connection.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization, other than the Company.

7.      **Compliance with Other Agreements and Obligations**

I represent and warrant that my employment by Connection and the execution and performance of this Agreement will not breach or be in conflict with any other agreement to which I am a party or am bound, and that I am not now subject to any covenants against competition or similar covenants or other obligations to third parties or to any court order, judgment or decree that would affect the performance of my obligations hereunder or my duties and responsibilities to the Company, except as I have disclosed in writing to the Company no later than the time I return an executed copy of this Agreement.

8.      **Entire Agreement; Severability; Modification**

This Agreement sets forth the entire agreement between me and Connection, and supersedes all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the subject matter hereof.  Provided, however, this Agreement shall not terminate or supersede any additional obligations I may have pursuant to any other agreement or under applicable law with respect to confidentiality, non-competition, assignment of rights to intellectual property or the like. In the event of conflict between this Agreement and any prior agreement between me and the Company, this Agreement shall govern.  The provisions of this Agreement are severable, and no breach of any provision of this Agreement by the Company, or any other claimed breach of contract or violation of law, shall operate to excuse my obligation to fulfill the requirements of Paragraphs 3 and 4 hereof.  No deletion, addition, marking, notation or other change to the body of this Agreement shall be of any force or effect, and this Agreement shall be interpreted as if such change had not been made.  This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by me and an expressly authorized officer of Connection.  If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect, it shall not affect any other provisions, and shall be construed by limiting it so as to be enforceable to the maximum extent permissible by

law. Provisions of this Agreement shall survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purpose of other surviving provisions. It is agreed and understood that no changes to the nature or scope of my employment relationship with Connection shall operate to extinguish my obligations hereunder or require that this Agreement be re-executed.

9.   **Extension of Restrictive Periods**

The restrictive periods set forth in Paragraph 4 of this Agreement shall not expire and shall be tolled during any period in which I am in violation of such restrictions, and therefore such restrictive period shall be extended for a period equal to the duration of my violation thereof.

10.   **Assignment**

Neither Connection nor I may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, the Company may assign its rights and obligations under this Agreement without my consent (a) in the event that I am transferred to a position with one of the Company's affiliates or (b) in the event that the Company shall hereafter effect a reorganization, consolidate with, or merge into any Person or transfer to any Person all or substantially all of the business, properties or assets of the Company or any division or line of business of the Company with which I am at any time associated. This Agreement shall inure to the benefit of and be binding upon me and the Company, and each of our respective successors, executors, administrators, heirs, representatives and permitted assigns.

11.   **At-Will Employment**

I acknowledge and agree that this Agreement does not in any way obligate Connection to retain my services for a fixed period or at a fixed level of compensation; nor does it in any way restrict my right or that of the Company to terminate my employment at any time, at will, with or without notice or cause.

12.   **Successors**

I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company, and any successor or permitted assign to whose employ I may be transferred, without the necessity that this Agreement be re-signed at the time of such transfer.

13.   **Choice of Law**

This is a New Hampshire contract and shall be governed by and construed in accordance with the laws of the State of New Hampshire, without regard to the conflict of laws principles thereof.

31405286_2 CONNECTION Non-MA or CA  10.2018

14. **Acknowledgement of Understanding**

In signing this Agreement, I give the Company assurance that I have read and understood all of its terms; that I have had a full and reasonable opportunity to consider its terms and to consult with any person of my choosing before signing; that I have not relied on any agreements or representations, express or implied, that are not set forth expressly in this Agreement; and that I have signed this Agreement knowingly and voluntarily.

Intending to be legally bound hereby, I have signed this Agreement under seal as of the day and year written below.

Signature: _____

Printed Name: _____Peter Sillich_____

Date: _____8/1/20_____

-11-

EXHIBIT A

LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| TITLE | DATE | IDENTIFYING NUMBER OR BRIEF DESCRIPTION |
|-------|------|------------------------------------------|
|       |      |                                          |

_____X_____ No inventions or improvements

_____ Additional sheets attached

Signature of Employee: _____
                              Full Name

Date: _____08/03/2020_____

(Prior Inventions)
31405286_2

EXHIBIT B

TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blue-prints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, including without limitation any such items in electronic form, belonging to PC Connection, Inc., d/b/a Connection, its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Employee Agreement signed by me (the "Agreement"), including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that Agreement.

I further agree that, in compliance with the Agreement, I will preserve as confidential all Confidential Information (as defined therein), including, without limitation, trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matters pertaining to any business of the Company or any of its employees, customers, consultants or licenses.

I further agree that I will comply with the restrictions imposed by Paragraphs 3 and 4 of the Agreement.

Date: _____

                            __FOR EXAMPLE ONLY__
                            Employee

(Termination Certificate)

# EXHIBIT B

 **HINCKLEY ALLEN**

650 Elm Street
Manchester, NH 03101-2596

p: 603-225-4334   f: 603-224-8350

**Christopher H.M. Carter**
ccarter@hinckleyallen.com
Direct Dial: (603) 225-4334

September 1, 2022

**VIA EMAIL AND OVERNIGHT DELIVERY**
*Pjsillich2@gmail.com*
Peter Sillich
259 Spruce Street, Apt. 3
Manchester, NH  03103

Re:      **Violation of Non-Competition/Non-Soliciation Covenants**

Mr. Sillich:

Hinckley Allen represents PC Connection, Inc. d/b/a Connection and its affiliates, including Connection Business Solutions (collectively "Connection" or the "Company").  Connection has discovered that since your employment with the Company terminated on or about August 1, 2022, you have attempted to interfere with Connection accounts that were assigned to you while you worked for the Company.  This conduct violates the non-competition and non-solicitation covenants in your August 1, 2020 Employment Agreement (the "Agreement") with Connection (see copy attached).  The purpose of this letter is to demand that you immediately cease and desist engaging in any further conduct in violation of the Agreement.

As you know, the Agreement prohibits you from disclosing – either now or at any time in the future – Connection's trade secrets and confidential information.  In addition, for a restricted period of 18 months following the termination of your employment, you may not:

- Compete with the Company in the sales, marketing, and service of IT products, computers, computer hardware and software, and related services to any Connection customer or prospective customer.

- Work for a reseller or other entity that competes with Connection in the sales, marketing, and service of IT products, computers, computer hardware and software, and related services.

- Work for a Connection supplier, vendor, or business partner that competes with the Company in the sales, marketing, and service of IT products, computers, computer hardware and software, and related services to any Connection customer or prospective customer.
- Solicit any Connection customer that you performed work for, or had other than incidental contact during your employment with Connection.

Peter Sillich
September 1, 2022
Page 2

- Solicit any Connection employee to leave the Company.

Furthermore, during the 18-month restricted period, you are required to notify Connection in writing of each new job or business activity that you plan to engage in at least two weeks before beginning that job or activity.  You have not complied with this requirement.  Your Linked-In profile indicates that you are now working for, or conducting business as, "Peter's IT Solutions."

Connection has been advised that you recently violated the Agreement by attempting to induce one of the Company's partners (HPE) to work with you in pursuing an account (REDACTED REDACTED) that you and the partner had worked on while you were employed by Connection.  By this letter, you are hereby directed to cease and desist engaging in any further conduct in violation of the Agreement.

In addition, I hereby request that no later than **September 7, 2022,** you provide to me, as counsel for Connection, with:

(a)     A complete and accurate list of each and every Connection customer or prospective customer that you have contacted or attempted to contact since your employment with Connection ended;

(b)     A complete description of your current job or business activities and the name and location of each entity through which you are performing said job or activities;

(c)     Written confirmation that during the 18-month restricted period, you will comply with the non-compete, non-solicitation, and non-disclosure covenants in the Agreement.

Should you fail to cease violating the Agreement, Connection shall immediately pursue all available legal remedies, including injunctive relief and recovery of all damages and attorney's fees as provided under the Agreement.  Connection reserves all rights and remedies.

Finally, please allow this letter to serve as formal notice that you should preserve all email, text messages, and other documents or communications that relate to sales efforts or other business activities that you have engaged in since leaving Connection.  You should not engage in the destruction or alteration of any such information.

Sincerely,

Christopher H.M. Carter
CHMC/smc

Cc:     Client

# EMPLOYEE AGREEMENT

I, the undersigned, acknowledge the importance to PC Connection, Inc. d/b/a Connection, and each of the Connection family of companies, existing now or in the future (hereinafter referred to collectively as "Connection" or the "Company") of protecting its confidential information and other legitimate business interests, including without limitation the valuable trade secrets and good will that it has developed or acquired. I also acknowledge that Connection is engaged in a highly competitive business, that its success in the marketplace depends upon the preservation of its confidential information and industry reputation, and that the Company's practice of obtaining agreements such as this one from its employees is both known to me and reasonable. Therefore, in consideration of my initial and/or ongoing employment with the Company, in consideration of my being granted access to trade secrets and other confidential information of the Company, and for other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge:

1. **Loyalty and Conflicts of Interest**

    1.1 <u>Exclusive Duty</u>. I agree that, during my employment, I will devote my full working time and my best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of Connection and to the discharge of my duties and responsibilities on its behalf. I further agree not to engage in any other business activity or serve in any industry, trade, professional, governmental or academic position during my employment with the Company, unless I have first received the express written approval of a duly authorized officer of the Company.

    1.2 <u>Compliance with Company Policy</u>. I agree to comply with all policies, practices and procedures of Connection, as these may be implemented and/or changed by the Company from time to time. Without limiting the generality of the foregoing, I acknowledge that Connection may from time to time have agreements with other Persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding Intellectual Property, as defined below, created during the course of work under such agreements and/or regarding the confidential nature of such work. I agree that I will comply with and be bound by all such obligations and restrictions which the Company conveys to me, and that I will take all actions necessary to discharge the obligations of the Company under such agreements.

2. **Confidentiality**

    2.1 <u>Nondisclosure and Nonuse of Confidential Information</u>. I agree that all Confidential Information, as defined below, which I create or to which I have access as a result of my employment and other associations with the Company is and shall remain the sole and exclusive property of Connection. I agree that, except as required for the proper performance of my regular duties for the Company, as expressly authorized in writing in advance by the Company, or as required by applicable law, I will never, directly or indirectly, use or disclose any

Confidential Information. I understand and agree that this restriction shall continue to apply after the termination of my employment or this Agreement, howsoever caused. Further, I agree to furnish prompt notice to Connection of any required disclosure of Confidential Information sought pursuant to subpoena, court order or any other legal process or requirement, and agree to provide the Company a reasonable opportunity to seek protection of the Confidential Information prior to any such disclosure.

2.2     <u>Use and Return of Documents</u>. I agree that all documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of Connection and any copies (including without limitation electronic), in whole or in part, thereof (the "Documents" and each individually, a "Document"), whether or not prepared by me, shall be the sole and exclusive property of the Company. Except as required for the proper performance of my regular duties for Connection or as expressly authorized in writing in advance by the Company, I will not copy any Documents or remove any Documents or copies or derivatives thereof from the premises of the Company. I will safeguard, and return to the Company immediately upon termination of my employment, and/or at such other times as may be specified by the Company, all Documents and other property of the Company, and all documents, records and files of its customers, subcontractors, vendors and suppliers ("Third-Party Documents" and each individually a "Third-Party Document"), as well as all other property of such customers, subcontractors, vendors and suppliers, then in my possession or control. Provided, however, if a Document or Third-Party Document is on electronic media, I may, in lieu of surrender of the Document or Third-Party Document, provide a copy on electronic media (*e.g.*, a properly formatted diskette) to the Company and delete and overwrite all other electronic media copies thereof. I further agree that, upon request of any duly authorized officer of Connection, I will disclose all passwords necessary or desirable to enable the Company to obtain access to the Documents and Third-Party Documents.

2.3     <u>Defend Trade Secrets Act of 2016</u>. Under the federal Defend Trade Secrets Act of 2016, I understand that I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to my attorney in relation to a lawsuit for retaliation against me for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

3.     **Intellectual Property and Inventions**

3.1     <u>Ownership and Licensing</u>. I shall maintain accurate and complete contemporaneous records of, and shall immediately and fully disclose and deliver to Connection, all Intellectual Property, as defined below. I have attached hereto as <u>Exhibit A</u> a list describing all inventions, original works of authorship,

31405286_2 CONNECTION Non-MA or CA  10.2018

developments, improvements, and trade secrets which were made by me prior or otherwise unrelated to my employment with the Company, which belong to me and which are not assigned to the Company hereunder (collectively referred to as "Prior Inventions"); and, if no such list is attached, I represent and warrant that there are no such Prior Inventions. If, in the course of my employment with the Company, I incorporate into any of the Intellectual Property any Prior Inventions or any other invention, improvement, development, concept, discovery or other proprietary information owned by me or in which I have an interest (collectively, including Prior Inventions, "Employee Inventions"), I hereby grant Connection an irrevocable, worldwide, fully paid-up, royalty-free, non-exclusive license, with the right to sublicense through multiple tiers, to make, use, sell, improve, reproduce, distribute, perform, display, transmit, manipulate in any manner, create derivative works based upon, and otherwise exploit or utilize in any manner the Intellectual Property. All copyrightable works that I create, including without limitation computer programs and documentation, shall be considered "works made for hire" and shall, upon creation, be owned exclusively by Connection.

3.2     <u>Assignment of Rights</u>. I hereby assign and agree in the future to assign to Connection (or as otherwise directed by the Company) my full right, title and interest in and to all Intellectual Property. I further agree to waive and hereby do waive all claims to moral and other rights I may have in any Intellectual Property. I agree to provide, at the Company's request, all further cooperation which the Company determines is necessary or desirable to accomplish the complete transfer of the Intellectual Property and all associated rights to the Company, its successors, assigns and nominees, and to ensure the Company the full enjoyment of the Intellectual Property, including without limitation executing further applications (both domestic and foreign), specifications, oaths, assignments, consents, releases, government communications and other commercially reasonable documentation, responding to corporate diligence inquiries, and providing good faith testimony by affidavit, declaration, and/or deposition, in-person or by other proper means, in support of any effort by the Company to establish, perfect, defend, or otherwise enjoy, in this or any foreign country, its rights acquired pursuant to this Agreement through prosecution of governmental filings, regulatory proceedings, litigation or other means.

To the extent I cannot transfer and assign my entire right, title, and interest to the Intellectual Property, or any portion thereof, then I will assign and transfer all right, title, and interest in and to the Intellectual Property to Connection at the first opportunity to do so. To the extent that I cannot assign and transfer any of my full right, title, and interest in the Intellectual Property, then I hereby grant the Company an irrevocable, worldwide, fully paid-up, royalty-free, exclusive license, with the right to sublicense through multiple tiers, to make, use, sell, improve, reproduce, distribute, perform, display, transmit, manipulate in any manner, create derivative works based upon, and otherwise exploit or utilize in any manner the Intellectual Property. If Connection is unable because of my mental or physical incapacity or for any other reason to secure my signature for any of the assignments, licenses, or other reasonably requested documents

-3-

pertaining to the Intellectual Property referenced in Paragraph 3 hereof within ten days of the delivery of said documents to me, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file said documents and to do all other lawfully permitted acts to further the perfection, defense, and enjoyment of the Company's rights relating to the Intellectual Property with the same legal force and effect as if executed by me. I stipulate and agree that such appointment is a right coupled with an interest, and will survive my incapacity or unavailability at any future time.

I understand and agree that to the extent this Agreement shall be construed in accordance with the laws of any state which precludes a requirement in an agreement such as this to assign to an employer certain classes of inventions developed by an employee, this Paragraph 2(b) shall be interpreted to exclude any invention which a court of competent jurisdiction determines to fall within such classes.

3.3    <u>Delivery of Intellectual Property-Related Information</u>.  I agree that I will assign, deliver and communicate to Connection, its representatives or agents, and its successors and assigns, any know-how, facts and materials arising from or relating to Intellectual Property, including without limitation: (i) all simulations, prototypes, and other embodiments of the Intellectual Property; (ii) all drawings, blueprints, calculations, research plans and results, lab notes, workbooks, software and other records and written materials that relate to the Intellectual Property or that embody or record any know-how pertaining to the Intellectual Property; (iii) all files, documents and communications pertaining to the Intellectual Property; and (iv) evidence for patent interference purposes or for other legal proceedings whenever requested.  I will not charge the Company, its successors or assigns for time spent in complying with my obligations under Paragraphs 3 of this Agreement.

3.4    <u>Original Work</u>.  I hereby represent and warrant that all of the product resulting from my work for the Company will be original and will not infringe the rights of any third party, including without limitation intellectual property rights, such as rights pertaining to patents, trademarks, copyrights and trade secrets.  I further represent that I have not taken, copied or otherwise shared with Connection any confidential or proprietary documents or other material belonging to any former employer or other third party; and I covenant that I will at no time during the course of my employment with the Company use or disclose any confidential or proprietary information belonging to any third party without that party's express consent.

3.5    <u>Waiver and Indemnification</u>.  I agree that I will not, and will not permit anyone acting on my behalf to, assert against the Company, its directors, shareholders, officers, managers, members, joint venturers, employees, representatives or agents (collectively, with the Company, the "Corporate Group") any cause of action, right or claim, of any kind or nature, with respect to the Intellectual

Property or any Employee Inventions, including without limitation Employee Inventions incorporated into the Intellectual Property, and I agree to indemnify and hold harmless the Corporate Group, and each of them, from any and all causes of action, rights or claims, of any kind or nature, losses, damages, costs and expenses, including without limitation attorneys' fees, and any and all other liabilities incurred by any of the Corporate Group arising from or relating to proprietary rights in the Employee Inventions, or any of them, or resulting from my failure to meet any of my obligations under Paragraph 3 of this Agreement.

4.     **Non-Competition and Other Restricted Activity**

4.1     <u>Non-Competition</u>. I agree that the Non-Solicitation and Nondisclosure restrictions in this Agreement will not sufficiently protect the Company's business interests, including but not limited to its trades secrets, confidential information, and good will. Accordingly, I agree that, during my employment and during the 18-month period immediately following the termination of my employment for any reason (the "restricted period"), I will not, directly or indirectly, compete, or undertake any planning to compete, with Connection, whether as an owner, partner, investor, consultant, employee or otherwise. Specifically, but without limiting the foregoing, I agree not to work or provide services, in any capacity, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Person who is engaged in any business that is competitive with the business of the Company, as conducted or in planning during my employment. A competitive business shall, without express or implied limitation, include any Person engaged in the sales, marketing, and/or service of information technology products, computers, and computer networking hardware, software, peripherals and related services (both remote and on-site) through any means, including without express or implied limitation field sales and telephonic and electronic commerce, provided the Person is engaged in such competitive business in one or more of the same geographic territories served by Connection. I further agree, during the restricted period, not to be employed or otherwise engaged by a client or customer of the Company and provide for such client or customer the same or similar technical, computer support or other services which I provided to such client or customer while employed by the Company. I also agree, during the restricted period, not to be employed or otherwise engaged by a supplier, vendor or business partner of the Company, if such supplier, vendor or business partner competes with the Company regarding the sales, marketing, and service of information technology products, computers, and computer networking hardware, software, peripherals and related services to any customer or prospective customer. I understand that the foregoing shall not prevent my passive ownership of one percent (1%) or less of the equity securities of any publicly traded company.

4.2     <u>Good Will</u>. I acknowledge and agree that any and all good will which I develop during my employment with any of the customers, prospective customers, subcontractors or suppliers of Connection shall be the sole, exclusive and

permanent property of the Company, and shall continue to be such after the termination of my employment, howsoever caused.

4.3    <u>Non-Solicitation of Customers</u>.  I agree that, during my employment and during the 18-month period immediately following the termination of my employment for any reason, I will not, directly or indirectly, (a) solicit, encourage or induce any customer of Connection to terminate or diminish its business relationship or patronage with the Company; (b) seek to persuade or induce any such customer or prospective customer of Connection to conduct with anyone else any business or activity which such customer or prospective customer conducts or could conduct with the Company; or (c) accept business from any such customer.  Provided, these restrictions shall apply (y) only with respect to those Persons who are or have been a customer of Connection at any time within the immediately preceding one-year period or whose business has been solicited on behalf of the Company by any of its officers, employees or agents within said one-year period, other than by form letter, blanket mailing or published advertisement, and (z) only if I have performed work for such Person during my employment with the Company or have been introduced to, or otherwise had non-incidental contact with, such Person as a result of my employment or other associations with the Company or have had access to Confidential Information which would assist in the solicitation of such Person.

4.4    <u>Non-Solicitation/Non-Hiring of Employees and Independent Contractors</u>.  I agree that, during my employment and for the 18-month period immediately following the termination of my employment for any reason, I will not, and will not directly or indirectly assist anyone else to, (a) hire or solicit for hiring any employee of the Company or seek to persuade or induce any employee of the Company to discontinue employment with the Company, or (b) hire or engage any independent contractor providing services to the Company, or solicit, encourage or induce any independent contractor providing services to the Company to terminate or diminish its business relationship with the Company.  For the purposes of this Agreement, an "employee" or "independent contractor" of Connection is any person who is or was such at any time within the preceding six-month period.

4.5    <u>Notice of New Address and Employment</u>.  During the 18-month period immediately following the termination of my employment for any reason, I will notify Connection in writing of any change in my address and of each new job or other business activity in which I plan to engage at least two weeks prior to beginning such job or activity.  Such notice shall state the name and address of any new employer and the nature of my position.  I further agree to provide Connection with any other pertinent information concerning such business activity as the Company may reasonably request in order to determine my continued compliance with my obligations under this Agreement.  I agree to notify my new employer(s) of my obligations under this Agreement, and hereby consent to notification by the Company to my new employer(s) concerning my obligations under this Agreement.

4.6    <u>Acknowledgement of Reasonableness; Remedies</u>.  In signing this Agreement, I give the Company assurance that I have carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed on me under this Agreement.  I agree without reservation that each of the restraints contained herein is necessary for the reasonable and proper protection of the good will, Confidential Information and other legitimate business interests of Connection, that each and every one of those restraints is reasonable in respect to subject matter, length of time and geographic area; and that these restraints will not prevent me from obtaining other suitable employment during the period in which I am bound by them.  I agree that I will never assert, or permit to be asserted on my behalf, in any forum, any position contrary to the foregoing.  I also acknowledge and agree that, were I to breach any of the provisions of this Agreement, the harm to the Company would be irreparable.  I therefore agree that, in the event of such a breach or threatened breach, the Company shall, in addition to any other remedies available to it, have the right to obtain preliminary and permanent injunctive relief against any such breach or threatened breach without having to post bond, and will additionally be entitled to an award of attorney's fees incurred in connection with securing any relief hereunder.  Without limiting the generality of the foregoing, I agree that, in the event of my breach of any of the provisions of this Agreement, the Company shall have the immediate right to terminate any shares of restricted stock and stock options that have been awarded to me by the Company, notwithstanding anything to the contrary in any applicable grant document, stock option plan, and any other applicable agreements and plans.  I further agree that, in the event that any provision of this Agreement shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.  Finally, I agree that the periods of restriction set forth in Paragraph 4 of this Agreement shall be tolled, and shall not run, during any period of time in which I am in violation of the terms thereof, in order that the Company shall have all of the agreed-upon temporal protection recited herein.

4.7    <u>Consent to Jurisdiction</u>.  The parties agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the state or federal courts in the State of New Hampshire, and I voluntarily submit to the exclusive jurisdiction over my person by a court of competent jurisdiction located within the State of New Hampshire.  The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the State of New Hampshire, and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum.  This Agreement is intended to supplement, and not supersede, any remedies or claims that may be available to the Company under applicable law, including any claims asserting misappropriation of trade secrets or unfair trade practices.  I agree to accept service of process by registered or certified mail or the equivalent directed

to my last known address on the books of the Company, or by whatever other means are permitted by such court.

5.   **Exit Interview**

I agree that, at the time my employment ends, I will participate in an exit interview conducted by a designated representative of Connection, and that I will otherwise cooperate with the Company to assure a smooth transition of my duties and responsibilities.  If requested to do so by the Company, either during or after my employment with the Company, I agree to sign a termination certificate in the form attached hereto as <u>Exhibit B,</u> in which I confirm that I have complied with the requirements of this Agreement and that I am aware that certain restrictions imposed upon me by this Agreement continue after the termination of my employment.  I understand, however, that my rights and obligations under this Agreement will continue even if I do not sign a termination certificate.

6.   **Definitions**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings provided in this paragraph and as provided elsewhere in this Agreement. For purposes of this Agreement, the following definitions apply:

"Confidential Information" means any and all information of Connection, whether or not in writing, that is not generally known by others with whom the Company competes or does business, or with whom it plans to compete or do business, and any and all information, which, if disclosed, would assist in competition against the Company, including but not limited to (a) all proprietary information of the Company, including but not limited to the existing and future products and services, technical data, methods, processes, know-how, developments, inventions, and formulae of the Company, (b) the development, research, testing, marketing and financial activities and strategic plans of the Company, (c) the manner in which the Company operates, including information about the experience and quality of its employees and contractors, (d) its costs and sources of supply, (e) the identity and special needs of the customers, prospective customers and subcontractors of the Company, and (f) the people and organizations with whom the Company has business relationships and the substance of those relationships. Without limiting the generality of the foregoing, Confidential Information shall specifically include:  (i) any and all product testing methodologies, product test results, research and development plans and initiatives, marketing research, plans and analyses, strategic business plans and budgets, short and long-range product, sales, marketing, expansion, diversification and similar plans; (ii) any and all vendor, supplier and purchase records, including without limitation the identity of contacts at any vendor, any list of vendors or suppliers, any oral or written agreements, any lists of purchase transactions and/or prices paid; and (iii)  any and all customer lists and customer and sales records, including without limitation the identity of contacts at purchasers, any list of purchasers, and any list of sales transactions and/or prices charged by the Company. Confidential Information also includes any information that the Company may receive or

has received from customers, subcontractors, suppliers or others, with any understanding, express or implied, that the information would not be disclosed.

"Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable, copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by me (whether alone or with others, and whether or not during normal business hours or on or off Company premises) during the period of my employment that relate in any way to the business or products of the Company, or to any prospective activity of the Company, or which make use of the Confidential Information or of facilities or equipment of Connection.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization, other than the Company.

7.      **Compliance with Other Agreements and Obligations**

I represent and warrant that my employment by Connection and the execution and performance of this Agreement will not breach or be in conflict with any other agreement to which I am a party or am bound, and that I am not now subject to any covenants against competition or similar covenants or other obligations to third parties or to any court order, judgment or decree that would affect the performance of my obligations hereunder or my duties and responsibilities to the Company, except as I have disclosed in writing to the Company no later than the time I return an executed copy of this Agreement.

8.      **Entire Agreement; Severability; Modification**

This Agreement sets forth the entire agreement between me and Connection, and supersedes all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the subject matter hereof.  Provided, however, this Agreement shall not terminate or supersede any additional obligations I may have pursuant to any other agreement or under applicable law with respect to confidentiality, non-competition, assignment of rights to intellectual property or the like. In the event of conflict between this Agreement and any prior agreement between me and the Company, this Agreement shall govern.  The provisions of this Agreement are severable, and no breach of any provision of this Agreement by the Company, or any other claimed breach of contract or violation of law, shall operate to excuse my obligation to fulfill the requirements of Paragraphs 3 and 4 hereof.  No deletion, addition, marking, notation or other change to the body of this Agreement shall be of any force or effect, and this Agreement shall be interpreted as if such change had not been made.  This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by me and an expressly authorized officer of Connection.  If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect, it shall not affect any other provisions, and shall be construed by limiting it so as to be enforceable to the maximum extent permissible by

-9-

law. Provisions of this Agreement shall survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purpose of other surviving provisions.  It is agreed and understood that no changes to the nature or scope of my employment relationship with Connection shall operate to extinguish my obligations hereunder or require that this Agreement be re-executed.

9.     **Extension of Restrictive Periods**

The restrictive periods set forth in Paragraph 4 of this Agreement shall not expire and shall be tolled during any period in which I am in violation of such restrictions, and therefore such restrictive period shall be extended for a period equal to the duration of my violation thereof.

10.    **Assignment**

Neither Connection nor I may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, the Company may assign its rights and obligations under this Agreement without my consent (a) in the event that I am transferred to a position with one of the Company's affiliates or (b) in the event that the Company shall hereafter effect a reorganization, consolidate with, or merge into any Person or transfer to any Person all or substantially all of the business, properties or assets of the Company or any division or line of business of the Company with which I am at any time associated.  This Agreement shall inure to the benefit of and be binding upon me and the Company, and each of our respective successors, executors, administrators, heirs, representatives and permitted assigns.

11.    **At-Will Employment**

I acknowledge and agree that this Agreement does not in any way obligate Connection to retain my services for a fixed period or at a fixed level of compensation; nor does it in any way restrict my right or that of the Company to terminate my employment at any time, at will, with or without notice or cause.

12.    **Successors**

I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company, and any successor or permitted assign to whose employ I may be transferred, without the necessity that this Agreement be re-signed at the time of such transfer.

13.    **Choice of Law**

This is a New Hampshire contract and shall be governed by and construed in accordance with the laws of the State of New Hampshire, without regard to the conflict of laws principles thereof.

31405286_2 CONNECTION Non-MA or CA  10.2018

14.     **Acknowledgement of Understanding**

In signing this Agreement, I give the Company assurance that I have read and understood all of its terms; that I have had a full and reasonable opportunity to consider its terms and to consult with any person of my choosing before signing; that I have not relied on any agreements or representations, express or implied, that are not set forth expressly in this Agreement; and that I have signed this Agreement knowingly and voluntarily.

Intending to be legally bound hereby, I have signed this Agreement under seal as of the day and year written below.

Signature: _Peter Sillich_

Printed Name: _Peter Sillich_

Date: _8/1/20_

EXHIBIT A

LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| TITLE | DATE | IDENTIFYING NUMBER OR BRIEF DESCRIPTION |
|---|---|---|

_____X_____ No inventions or improvements

_____ Additional sheets attached

Signature of Employee: _____
Full Name

Date: _____

EXHIBIT B

TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blue-prints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, including without limitation any such items in electronic form, belonging to PC Connection, Inc., d/b/a Connection, its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Employee Agreement signed by me (the "Agreement"), including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that Agreement.

I further agree that, in compliance with the Agreement, I will preserve as confidential all Confidential Information (as defined therein), including, without limitation, trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matters pertaining to any business of the Company or any of its employees, customers, consultants or licenses.

I further agree that I will comply with the restrictions imposed by Paragraphs 3 and 4 of the Agreement.

Date: _____

_____FOR EXAMPLE ONLY_____
Employee

(Termination Certificate)

# EXHIBIT C

**From:** Peter Sillich <pjsillich2@gmail.com>
**Date:** September 7, 2022 at 12:31:05 PM EDT
**To:** "Comer, Susan M." <scomer@hinckleyallen.com>
**Subject: Re: Sent on behalf of Attorney Chris Carter**

[EXTERNAL EMAIL]

Hi Susan,

I am currently unemployed. I recently moved to SC with my girlfriend.
A previous customer of mine (REDACTED  reached out to me and explained his
dissatisfaction with his new Connection rep.
The customer asked me to continue to work the switch deal with him since I was the person
responsible for articulating the solution.

I mentioned to the customer that I am currently not working and couldn't be of any help.
Since leaving Connection I have not reached out to any of my old customers.
I agree to comply with the non compete,non solicit.

Best regards,
Pete

On Thu, Sep 1, 2022 at 9:25 AM Comer, Susan M. <scomer@hinckleyallen.com> wrote:

Mr. Sillich –

Please see attached correspondence from Attorney Carter.  A hard copy will be delivered via overnight mail.

**Susan M. Comer**
*Legal Administrative Assistant*

---

Hinckley Allen
650 Elm Street
Manchester, NH 03101-2596
p: 603-545-6146 | f: 603-224-8350
scomer@hinckleyallen.com

# EXHIBIT D



**HINCKLEY
ALLEN**

20 Church Street
Hartford, CT 06103-1221

p: 860-725-6200   f: 860-278-3802
hinckleyallen.com


LISA A. ZACCARDELLI
(860) 331-2764 Direct
lzaccardelli@hinckleyallen.com

September 28, 2022

**VIA ELECTRONIC MAIL psillich@partneroneit.com**

Peter Sillich
119 Beckley Drive
Greer, SC 29650

> **Re:     Obligations to PC Connection, Inc. Cease and Desist**

Dear Mr. Sillich:

Hinckley Allen represents PC Connection, Inc. d/b/a Connection and its affiliates, (collectively "Connection" or the "Company").  On July 28, 2022 your employment with Connection was terminated due to your conduct at the Company.  In your exit interview with Connection you were specifically reminded of your obligations and the restrictions in the non-competition and non-solicitation Employment Agreement (the "Agreement").  (A copy of this Agreement is attached hereto).  Connection has discovered that you joined a direct competitor, PartnerOne and further in that role you have directly solicited Connection customers who were assigned to you  as an account manager. This conduct violates the terms of your employee agreement with Connection.   The purpose of this letter is to demand that you immediately cease and desist engaging in any further conduct in violation of the Agreement.

Under the Agreement, during the 18-month period after the termination of your employment with Connection, you may not:

- Work for an entity that competes with Connection in the sale and marketing of IT products and services in the same geographic territory served by Connection.

- Work for a Connection supplier, vendor or business partner that competes with the Company in the sale and marketing of IT products and services to Connection's customers or prospective customers.

Peter Sillich
September 28, 2022
Page 2

- Directly or indirectly solicit any Connection customer or prospective customer as to which, during your employment with Connection, you performed work, had other than incidental contact, or had access to confidential information.

Through your work with Connection, you received and had access to highly confidential purchasing and pricing information concerning Connection's customers and prospective customers. You also were assigned responsibility for, and had extensive direct contact with, Connection's significant accounts. With PartnerOne, you are exploiting Connection's confidential information, as well as the customer relationships and customer goodwill that you developed through Connection, to the detriment of the Company. Connection has learned that you have directly sought pricing information about a Connection customer from REDACTED that you worked with while at Connection. Further, that you have directly interfered with a Connection Buying Account pushing them to relinquish incumbency status in direct contravention of the terms of your agreement. These actions are just some of the examples of your conduct in direct violation of the terms of your Agreement.

Your employment with Connection ended on or about July 28, 2022. The 18-month restricted period, which otherwise would have ended on January 28, 2023, has been extended by three months (until April 28, 2023) due to your breach of the Agreement.

I hereby request that no later than **September 30, 2022** you provide to me, as counsel for Connection, with written confirmation that during the restricted period, you will not compete with Connection in the sale of IT products to any customers or prospective customer of Connection Public Sector Solutions, and will not directly or indirectly solicit any such customers.

Should you fail to cease violating the Agreement, Connection shall immediately pursue all available legal remedies, including injunctive relief and recovery of all damages and attorney's fees as provided under the Agreement. Connection reserves all rights and remedies.

Finally, please allow this letter to serve as formal notice that you should preserve all information in your possession relating to your employment with PartnerOne, including but not limited to email, documents, text messages, notes, and social media postings concerning your hiring by PartnerOne; your sales and marketing efforts on behalf of PartnerOne; your communications with present or former Connection employees; and customers and accounts you have contacted while employed by PartnerOne. You should not engage in the destruction or alteration of any such information.

A copy of this letter is being delivered to PartnerOne. Please forward all future communications to my attention.

Peter Sillich
September 28, 2022
Page 3

Very truly yours,

*Lisa A. Zaccardelli*

Lisa A. Zaccardelli

LAZ/st
Enclosure

cc:     Connection

# EMPLOYEE AGREEMENT

I, the undersigned, acknowledge the importance to PC Connection, Inc. d/b/a Connection, and each of the Connection family of companies, existing now or in the future (hereinafter referred to collectively as "Connection" or the "Company") of protecting its confidential information and other legitimate business interests, including without limitation the valuable trade secrets and good will that it has developed or acquired. I also acknowledge that Connection is engaged in a highly competitive business, that its success in the marketplace depends upon the preservation of its confidential information and industry reputation, and that the Company's practice of obtaining agreements such as this one from its employees is both known to me and reasonable. Therefore, in consideration of my initial and/or ongoing employment with the Company, in consideration of my being granted access to trade secrets and other confidential information of the Company, and for other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge:

1. **Loyalty and Conflicts of Interest**

   1.1   Exclusive Duty. I agree that, during my employment, I will devote my full working time and my best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of Connection and to the discharge of my duties and responsibilities on its behalf. I further agree not to engage in any other business activity or serve in any industry, trade, professional, governmental or academic position during my employment with the Company, unless I have first received the express written approval of a duly authorized officer of the Company.

   1.2   Compliance with Company Policy. I agree to comply with all policies, practices and procedures of Connection, as these may be implemented and/or changed by the Company from time to time. Without limiting the generality of the foregoing, I acknowledge that Connection may from time to time have agreements with other Persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding Intellectual Property, as defined below, created during the course of work under such agreements and/or regarding the confidential nature of such work. I agree that I will comply with and be bound by all such obligations and restrictions which the Company conveys to me, and that I will take all actions necessary to discharge the obligations of the Company under such agreements.

2. **Confidentiality**

   2.1   Nondisclosure and Nonuse of Confidential Information. I agree that all Confidential Information, as defined below, which I create or to which I have access as a result of my employment and other associations with the Company is and shall remain the sole and exclusive property of Connection. I agree that, except as required for the proper performance of my regular duties for the Company, as expressly authorized in writing in advance by the Company, or as required by applicable law, I will never, directly or indirectly, use or disclose any

Confidential Information.  I understand and agree that this restriction shall continue to apply after the termination of my employment or this Agreement, howsoever caused.  Further, I agree to furnish prompt notice to Connection of any required disclosure of Confidential Information sought pursuant to subpoena, court order or any other legal process or requirement, and agree to provide the Company a reasonable opportunity to seek protection of the Confidential Information prior to any such disclosure.

2.2   <u>Use and Return of Documents</u>.  I agree that all documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of Connection and any copies (including without limitation electronic), in whole or in part, thereof (the "Documents" and each individually, a "Document"), whether or not prepared by me, shall be the sole and exclusive property of the Company.  Except as required for the proper performance of my regular duties for Connection or as expressly authorized in writing in advance by the Company, I will not copy any Documents or remove any Documents or copies or derivatives thereof from the premises of the Company.  I will safeguard, and return to the Company immediately upon termination of my employment, and/or at such other times as may be specified by the Company, all Documents and other property of the Company, and all documents, records and files of its customers, subcontractors, vendors and suppliers ("Third-Party Documents" and each individually a "Third-Party Document"), as well as all other property of such customers, subcontractors, vendors and suppliers, then in my possession or control.  Provided, however, if a Document or Third-Party Document is on electronic media, I may, in lieu of surrender of the Document or Third-Party Document, provide a copy on electronic media (*e.g.*, a properly formatted diskette) to the Company and delete and overwrite all other electronic media copies thereof. I further agree that, upon request of any duly authorized officer of Connection, I will disclose all passwords necessary or desirable to enable the Company to obtain access to the Documents and Third-Party Documents.

2.3   <u>Defend Trade Secrets Act of 2016</u>.  Under the federal Defend Trade Secrets Act of 2016, I understand that I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that:  (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to my attorney in relation to a lawsuit for retaliation against me for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

3.   **Intellectual Property and Inventions**

3.1   <u>Ownership and Licensing</u>.  I shall maintain accurate and complete contemporaneous records of, and shall immediately and fully disclose and deliver to Connection, all Intellectual Property, as defined below.  I have attached hereto as <u>Exhibit A</u> a list describing all inventions, original works of authorship,

developments, improvements, and trade secrets which were made by me prior or otherwise unrelated to my employment with the Company, which belong to me and which are not assigned to the Company hereunder (collectively referred to as "Prior Inventions"); and, if no such list is attached, I represent and warrant that there are no such Prior Inventions. If, in the course of my employment with the Company, I incorporate into any of the Intellectual Property any Prior Inventions or any other invention, improvement, development, concept, discovery or other proprietary information owned by me or in which I have an interest (collectively, including Prior Inventions, "Employee Inventions"), I hereby grant Connection an irrevocable, worldwide, fully paid-up, royalty-free, non-exclusive license, with the right to sublicense through multiple tiers, to make, use, sell, improve, reproduce, distribute, perform, display, transmit, manipulate in any manner, create derivative works based upon, and otherwise exploit or utilize in any manner the Intellectual Property. All copyrightable works that I create, including without limitation computer programs and documentation, shall be considered "works made for hire" and shall, upon creation, be owned exclusively by Connection.

3.2    <u>Assignment of Rights</u>. I hereby assign and agree in the future to assign to Connection (or as otherwise directed by the Company) my full right, title and interest in and to all Intellectual Property. I further agree to waive and hereby do waive all claims to moral and other rights I may have in any Intellectual Property. I agree to provide, at the Company's request, all further cooperation which the Company determines is necessary or desirable to accomplish the complete transfer of the Intellectual Property and all associated rights to the Company, its successors, assigns and nominees, and to ensure the Company the full enjoyment of the Intellectual Property, including without limitation executing further applications (both domestic and foreign), specifications, oaths, assignments, consents, releases, government communications and other commercially reasonable documentation, responding to corporate diligence inquiries, and providing good faith testimony by affidavit, declaration, and/or deposition, in-person or by other proper means, in support of any effort by the Company to establish, perfect, defend, or otherwise enjoy, in this or any foreign country, its rights acquired pursuant to this Agreement through prosecution of governmental filings, regulatory proceedings, litigation or other means.

To the extent I cannot transfer and assign my entire right, title, and interest to the Intellectual Property, or any portion thereof, then I will assign and transfer all right, title, and interest in and to the Intellectual Property to Connection at the first opportunity to do so. To the extent that I cannot assign and transfer any of my full right, title, and interest in the Intellectual Property, then I hereby grant the Company an irrevocable, worldwide, fully paid-up, royalty-free, exclusive license, with the right to sublicense through multiple tiers, to make, use, sell, improve, reproduce, distribute, perform, display, transmit, manipulate in any manner, create derivative works based upon, and otherwise exploit or utilize in any manner the Intellectual Property. If Connection is unable because of my mental or physical incapacity or for any other reason to secure my signature for any of the assignments, licenses, or other reasonably requested documents

pertaining to the Intellectual Property referenced in Paragraph 3 hereof within ten days of the delivery of said documents to me, then I hereby irrevocably designate and appoint the Company and its duly appointed officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file said documents and to do all other lawfully permitted acts to further the perfection, defense, and enjoyment of the Company's rights relating to the Intellectual Property with the same legal force and effect as if executed by me. I stipulate and agree that such appointment is a right coupled with an interest, and will survive my incapacity or unavailability at any future time.

I understand and agree that to the extent this Agreement shall be construed in accordance with the laws of any state which precludes a requirement in an agreement such as this to assign to an employer certain classes of inventions developed by an employee, this Paragraph 2(b) shall be interpreted to exclude any invention which a court of competent jurisdiction determines to fall within such classes.

3.3 <u>Delivery of Intellectual Property-Related Information</u>. I agree that I will assign, deliver and communicate to Connection, its representatives or agents, and its successors and assigns, any know-how, facts and materials arising from or relating to Intellectual Property, including without limitation: (i) all simulations, prototypes, and other embodiments of the Intellectual Property; (ii) all drawings, blueprints, calculations, research plans and results, lab notes, workbooks, software and other records and written materials that relate to the Intellectual Property or that embody or record any know-how pertaining to the Intellectual Property; (iii) all files, documents and communications pertaining to the Intellectual Property; and (iv) evidence for patent interference purposes or for other legal proceedings whenever requested. I will not charge the Company, its successors or assigns for time spent in complying with my obligations under Paragraphs 3 of this Agreement.

3.4 <u>Original Work</u>. I hereby represent and warrant that all of the product resulting from my work for the Company will be original and will not infringe the rights of any third party, including without limitation intellectual property rights, such as rights pertaining to patents, trademarks, copyrights and trade secrets. I further represent that I have not taken, copied or otherwise shared with Connection any confidential or proprietary documents or other material belonging to any former employer or other third party; and I covenant that I will at no time during the course of my employment with the Company use or disclose any confidential or proprietary information belonging to any third party without that party's express consent.

3.5 <u>Waiver and Indemnification</u>. I agree that I will not, and will not permit anyone acting on my behalf to, assert against the Company, its directors, shareholders, officers, managers, members, joint venturers, employees, representatives or agents (collectively, with the Company, the "Corporate Group") any cause of action, right or claim, of any kind or nature, with respect to the Intellectual

Property or any Employee Inventions, including without limitation Employee Inventions incorporated into the Intellectual Property, and I agree to indemnify and hold harmless the Corporate Group, and each of them, from any and all causes of action, rights or claims, of any kind or nature, losses, damages, costs and expenses, including without limitation attorneys' fees, and any and all other liabilities incurred by any of the Corporate Group arising from or relating to proprietary rights in the Employee Inventions, or any of them, or resulting from my failure to meet any of my obligations under Paragraph 3 of this Agreement.

4.    **Non-Competition and Other Restricted Activity**

4.1    <u>Non-Competition</u>. I agree that the Non-Solicitation and Nondisclosure restrictions in this Agreement will not sufficiently protect the Company's business interests, including but not limited to its trades secrets, confidential information, and good will. Accordingly, I agree that, during my employment and during the 18-month period immediately following the termination of my employment for any reason (the "restricted period"), I will not, directly or indirectly, compete, or undertake any planning to compete, with Connection, whether as an owner, partner, investor, consultant, employee or otherwise. Specifically, but without limiting the foregoing, I agree not to work or provide services, in any capacity, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Person who is engaged in any business that is competitive with the business of the Company, as conducted or in planning during my employment. A competitive business shall, without express or implied limitation, include any Person engaged in the sales, marketing, and/or service of information technology products, computers, and computer networking hardware, software, peripherals and related services (both remote and on-site) through any means, including without express or implied limitation field sales and telephonic and electronic commerce, provided the Person is engaged in such competitive business in one or more of the same geographic territories served by Connection. I further agree, during the restricted period, not to be employed or otherwise engaged by a client or customer of the Company and provide for such client or customer the same or similar technical, computer support or other services which I provided to such client or customer while employed by the Company. I also agree, during the restricted period, not to be employed or otherwise engaged by a supplier, vendor or business partner of the Company, if such supplier, vendor or business partner competes with the Company regarding the sales, marketing, and service of information technology products, computers, and computer networking hardware, software, peripherals and related services to any customer or prospective customer. I understand that the foregoing shall not prevent my passive ownership of one percent (1%) or less of the equity securities of any publicly traded company.

4.2    <u>Good Will</u>. I acknowledge and agree that any and all good will which I develop during my employment with any of the customers, prospective customers, subcontractors or suppliers of Connection shall be the sole, exclusive and

permanent property of the Company, and shall continue to be such after the termination of my employment, howsoever caused.

4.3    <u>Non-Solicitation of Customers</u>.  I agree that, during my employment and during the 18-month period immediately following the termination of my employment for any reason, I will not, directly or indirectly, (a) solicit, encourage or induce any customer of Connection to terminate or diminish its business relationship or patronage with the Company; (b) seek to persuade or induce any such customer or prospective customer of Connection to conduct with anyone else any business or activity which such customer or prospective customer conducts or could conduct with the Company; or (c) accept business from any such customer.  Provided, these restrictions shall apply (y) only with respect to those Persons who are or have been a customer of Connection at any time within the immediately preceding one-year period or whose business has been solicited on behalf of the Company by any of its officers, employees or agents within said one-year period, other than by form letter, blanket mailing or published advertisement, and (z) only if I have performed work for such Person during my employment with the Company or have been introduced to, or otherwise had non-incidental contact with, such Person as a result of my employment or other associations with the Company or have had access to Confidential Information which would assist in the solicitation of such Person.

4.4    <u>Non-Solicitation/Non-Hiring of Employees and Independent Contractors</u>.  I agree that, during my employment and for the 18-month period immediately following the termination of my employment for any reason, I will not, and will not directly or indirectly assist anyone else to, (a) hire or solicit for hiring any employee of the Company or seek to persuade or induce any employee of the Company to discontinue employment with the Company, or (b) hire or engage any independent contractor providing services to the Company, or solicit, encourage or induce any independent contractor providing services to the Company to terminate or diminish its business relationship with the Company.  For the purposes of this Agreement, an "employee" or "independent contractor" of Connection is any person who is or was such at any time within the preceding six-month period.

4.5    <u>Notice of New Address and Employment</u>.  During the 18-month period immediately following the termination of my employment for any reason, I will notify Connection in writing of any change in my address and of each new job or other business activity in which I plan to engage at least two weeks prior to beginning such job or activity.  Such notice shall state the name and address of any new employer and the nature of my position.  I further agree to provide Connection with any other pertinent information concerning such business activity as the Company may reasonably request in order to determine my continued compliance with my obligations under this Agreement.  I agree to notify my new employer(s) of my obligations under this Agreement, and hereby consent to notification by the Company to my new employer(s) concerning my obligations under this Agreement.

4.6     <u>Acknowledgement of Reasonableness; Remedies</u>.  In signing this Agreement, I give the Company assurance that I have carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed on me under this Agreement.  I agree without reservation that each of the restraints contained herein is necessary for the reasonable and proper protection of the good will, Confidential Information and other legitimate business interests of Connection, that each and every one of those restraints is reasonable in respect to subject matter, length of time and geographic area; and that these restraints will not prevent me from obtaining other suitable employment during the period in which I am bound by them.  I agree that I will never assert, or permit to be asserted on my behalf, in any forum, any position contrary to the foregoing.  I also acknowledge and agree that, were I to breach any of the provisions of this Agreement, the harm to the Company would be irreparable.  I therefore agree that, in the event of such a breach or threatened breach, the Company shall, in addition to any other remedies available to it, have the right to obtain preliminary and permanent injunctive relief against any such breach or threatened breach without having to post bond, and will additionally be entitled to an award of attorney's fees incurred in connection with securing any relief hereunder.  Without limiting the generality of the foregoing, I agree that, in the event of my breach of any of the provisions of this Agreement, the Company shall have the immediate right to terminate any shares of restricted stock and stock options that have been awarded to me by the Company, notwithstanding anything to the contrary in any applicable grant document, stock option plan, and any other applicable agreements and plans.  I further agree that, in the event that any provision of this Agreement shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.  Finally, I agree that the periods of restriction set forth in Paragraph 4 of this Agreement shall be tolled, and shall not run, during any period of time in which I am in violation of the terms thereof, in order that the Company shall have all of the agreed-upon temporal protection recited herein.

4.7     <u>Consent to Jurisdiction</u>.  The parties agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the state or federal courts in the State of New Hampshire, and I voluntarily submit to the exclusive jurisdiction over my person by a court of competent jurisdiction located within the State of New Hampshire.  The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the State of New Hampshire, and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum.  This Agreement is intended to supplement, and not supersede, any remedies or claims that may be available to the Company under applicable law, including any claims asserting misappropriation of trade secrets or unfair trade practices.  I agree to accept service of process by registered or certified mail or the equivalent directed

to my last known address on the books of the Company, or by whatever other means are permitted by such court.

5. **Exit Interview**

I agree that, at the time my employment ends, I will participate in an exit interview conducted by a designated representative of Connection, and that I will otherwise cooperate with the Company to assure a smooth transition of my duties and responsibilities. If requested to do so by the Company, either during or after my employment with the Company, I agree to sign a termination certificate in the form attached hereto as Exhibit B, in which I confirm that I have complied with the requirements of this Agreement and that I am aware that certain restrictions imposed upon me by this Agreement continue after the termination of my employment. I understand, however, that my rights and obligations under this Agreement will continue even if I do not sign a termination certificate.

6. **Definitions**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings provided in this paragraph and as provided elsewhere in this Agreement. For purposes of this Agreement, the following definitions apply:

"Confidential Information" means any and all information of Connection, whether or not in writing, that is not generally known by others with whom the Company competes or does business, or with whom it plans to compete or do business, and any and all information, which, if disclosed, would assist in competition against the Company, including but not limited to (a) all proprietary information of the Company, including but not limited to the existing and future products and services, technical data, methods, processes, know-how, developments, inventions, and formulae of the Company, (b) the development, research, testing, marketing and financial activities and strategic plans of the Company, (c) the manner in which the Company operates, including information about the experience and quality of its employees and contractors, (d) its costs and sources of supply, (e) the identity and special needs of the customers, prospective customers and subcontractors of the Company, and (f) the people and organizations with whom the Company has business relationships and the substance of those relationships. Without limiting the generality of the foregoing, Confidential Information shall specifically include: (i) any and all product testing methodologies, product test results, research and development plans and initiatives, marketing research, plans and analyses, strategic business plans and budgets, short and long-range product, sales, marketing, expansion, diversification and similar plans; (ii) any and all vendor, supplier and purchase records, including without limitation the identity of contacts at any vendor, any list of vendors or suppliers, any oral or written agreements, any lists of purchase transactions and/or prices paid; and (iii) any and all customer lists and customer and sales records, including without limitation the identity of contacts at purchasers, any list of purchasers, and any list of sales transactions and/or prices charged by the Company. Confidential Information also includes any information that the Company may receive or

-8-

has received from customers, subcontractors, suppliers or others, with any understanding, express or implied, that the information would not be disclosed.

"Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable, copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by me (whether alone or with others, and whether or not during normal business hours or on or off Company premises) during the period of my employment that relate in any way to the business or products of the Company, or to any prospective activity of the Company, or which make use of the Confidential Information or of facilities or equipment of Connection.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization, other than the Company.

7.     **Compliance with Other Agreements and Obligations**

I represent and warrant that my employment by Connection and the execution and performance of this Agreement will not breach or be in conflict with any other agreement to which I am a party or am bound, and that I am not now subject to any covenants against competition or similar covenants or other obligations to third parties or to any court order, judgment or decree that would affect the performance of my obligations hereunder or my duties and responsibilities to the Company, except as I have disclosed in writing to the Company no later than the time I return an executed copy of this Agreement.

8.     **Entire Agreement; Severability; Modification**

This Agreement sets forth the entire agreement between me and Connection, and supersedes all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the subject matter hereof.  Provided, however, this Agreement shall not terminate or supersede any additional obligations I may have pursuant to any other agreement or under applicable law with respect to confidentiality, non-competition, assignment of rights to intellectual property or the like. In the event of conflict between this Agreement and any prior agreement between me and the Company, this Agreement shall govern.  The provisions of this Agreement are severable, and no breach of any provision of this Agreement by the Company, or any other claimed breach of contract or violation of law, shall operate to excuse my obligation to fulfill the requirements of Paragraphs 3 and 4 hereof.  No deletion, addition, marking, notation or other change to the body of this Agreement shall be of any force or effect, and this Agreement shall be interpreted as if such change had not been made.  This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by me and an expressly authorized officer of Connection.  If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect, it shall not affect any other provisions, and shall be construed by limiting it so as to be enforceable to the maximum extent permissible by

law. Provisions of this Agreement shall survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purpose of other surviving provisions. It is agreed and understood that no changes to the nature or scope of my employment relationship with Connection shall operate to extinguish my obligations hereunder or require that this Agreement be re-executed.

9.    **Extension of Restrictive Periods**

The restrictive periods set forth in Paragraph 4 of this Agreement shall not expire and shall be tolled during any period in which I am in violation of such restrictions, and therefore such restrictive period shall be extended for a period equal to the duration of my violation thereof.

10.    **Assignment**

Neither Connection nor I may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, the Company may assign its rights and obligations under this Agreement without my consent (a) in the event that I am transferred to a position with one of the Company's affiliates or (b) in the event that the Company shall hereafter effect a reorganization, consolidate with, or merge into any Person or transfer to any Person all or substantially all of the business, properties or assets of the Company or any division or line of business of the Company with which I am at any time associated. This Agreement shall inure to the benefit of and be binding upon me and the Company, and each of our respective successors, executors, administrators, heirs, representatives and permitted assigns.

11.    **At-Will Employment**

I acknowledge and agree that this Agreement does not in any way obligate Connection to retain my services for a fixed period or at a fixed level of compensation; nor does it in any way restrict my right or that of the Company to terminate my employment at any time, at will, with or without notice or cause.

12.    **Successors**

I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company, and any successor or permitted assign to whose employ I may be transferred, without the necessity that this Agreement be re-signed at the time of such transfer.

13.    **Choice of Law**

This is a New Hampshire contract and shall be governed by and construed in accordance with the laws of the State of New Hampshire, without regard to the conflict of laws principles thereof.

-10-

14. **Acknowledgement of Understanding**

In signing this Agreement, I give the Company assurance that I have read and understood all of its terms; that I have had a full and reasonable opportunity to consider its terms and to consult with any person of my choosing before signing; that I have not relied on any agreements or representations, express or implied, that are not set forth expressly in this Agreement; and that I have signed this Agreement knowingly and voluntarily.

Intending to be legally bound hereby, I have signed this Agreement under seal as of the day and year written below.

Signature: _____

Printed Name: _____Peter Sillich_____

Date: _____8/1/20_____

EXHIBIT A

LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| TITLE | DATE | IDENTIFYING NUMBER OR BRIEF DESCRIPTION |
|---|---|---|

_____X_____ No inventions or improvements

_____ Additional sheets attached

Signature of Employee: _____
                              Full Name

Date: _____08/03/2020_____

EXHIBIT B

TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blue-prints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, including without limitation any such items in electronic form, belonging to PC Connection, Inc., d/b/a Connection, its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Employee Agreement signed by me (the "Agreement"), including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that Agreement.

I further agree that, in compliance with the Agreement, I will preserve as confidential all Confidential Information (as defined therein), including, without limitation, trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matters pertaining to any business of the Company or any of its employees, customers, consultants or licenses.

I further agree that I will comply with the restrictions imposed by Paragraphs 3 and 4 of the Agreement.

Date: _____

    __FOR EXAMPLE ONLY__
    Employee

(Termination Certificate)

# EXHIBIT E



**HINCKLEY ALLEN**

20 Church Street
Hartford, CT 06103-1221

p: 860-725-6200   f: 860-278-3802
hinckleyallen.com

LISA A. ZACCARDELLI
(860) 331-2764 Direct
lzaccardelli@hinckleyallen.com

September 28, 2022

**VIA OVERNIGHT DELIVERY**

Christina Watry
Partner One IT
4515 S. McClintock, Suite 206
Tempe, AZ 85282

> **Re:**   **Peter Sillich and PC Connection, Inc.**

Dear Ms. Watry:

This firm represents PC Connection, Inc. d/b/a Connection and its affiliates (collectively "Connection" or the "Company").  Please forward all future communications to my attention. The purpose of this letter is to place Partner One on notice of Mr. Sillich's continued obligations to Connection.

Connection has learned that a former Connection employee, Peter Sillich, is now working for Partner One IT ("Partner One") which competes with Connection in the sale of IT hardware, software and IT solutions and services.  In doing so, Mr. Sillich is violating the express terms of the non-competition, non-solicitation, and confidentiality agreement (the "Agreement") he signed on August 1, 2020.  (See copy attached.)   Furthermore, Connection has learned that contrary to the restrictions in the Agreement, Mr. Sillich is directly soliciting clients of Connection and interfering with its relationships with those clients in violation of the restrictions in his Agreement.

Under his Agreement with Connection, Mr. Sillich is prohibited, during the 18-month period after the termination of his employment (the "Restricted Period"), from:

- ▪ Working for an entity that competes with Connection in the sale and marketing of IT products and services in the same geographic territory served by Connection.

- ▪ Working for a Connection supplier, vendor or business partner that competes with the Company in the sale and marketing of IT products and services to Connection's customers or prospective customers.

Christina Watry
September 28, 2022
Page 2

▪ Directly or indirectly soliciting any Connection customer or prospective customer as to which, during her employment with Connection, he performed work, had other than incidental contact, or had access to confidential information.

Finally, Mr. Sillich was required to provide Connection with written two week notice before engaging in any new job or business activity.  In violation of that Agreement, Mr. Sillich never provided Connection with notice of his employment with Partner One.  Mr. Sillich has engaged in conduct directly soliciting Connection customers and utilizing confidential information of Connection is prohibited which is strictly prohibited.

Connection intends to ensure that Mr. Sillich fully complies with his ongoing contractual obligations to the Company.  Accordingly, Connection has directed Mr. Sillich to provide written confirmation no later than **September 30, 2022** that Partner One provide written confirmation that it has taken all steps necessary to ensure that it is not employing Mr. Sillich in a manner that violates his contractual obligations to Connection.

Finally, please also allow this letter to serve as a litigation hold notice for Partner One to preserve all documents and data relating to its employment of Mr. Sillich and Mr. Sillich's work for Partner One.  Partner One should not engage in the destruction or alteration of any such information, including but not limited to documents, correspondence, emails, text messages, notes, and social media postings.

Please forward all future communications on this matter to my attention.

Very truly yours,

HINCKLEY, ALLEN & SNYDER, LLP

*Lisa A. Zaccardelli*

Lisa A. Zaccardelli

LAZ/st
Enclosure

cc:      Connection

# EMPLOYEE AGREEMENT

I, the undersigned, acknowledge the importance to PC Connection, Inc. d/b/a Connection, and each of the Connection family of companies, existing now or in the future (hereinafter referred to collectively as "Connection" or the "Company") of protecting its confidential information and other legitimate business interests, including without limitation the valuable trade secrets and good will that it has developed or acquired. I also acknowledge that Connection is engaged in a highly competitive business, that its success in the marketplace depends upon the preservation of its confidential information and industry reputation, and that the Company's practice of obtaining agreements such as this one from its employees is both known to me and reasonable. Therefore, in consideration of my initial and/or ongoing employment with the Company, in consideration of my being granted access to trade secrets and other confidential information of the Company, and for other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge:

1. **Loyalty and Conflicts of Interest**

    1.1    Exclusive Duty.  I agree that, during my employment, I will devote my full working time and my best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of Connection and to the discharge of my duties and responsibilities on its behalf.  I further agree not to engage in any other business activity or serve in any industry, trade, professional, governmental or academic position during my employment with the Company, unless I have first received the express written approval of a duly authorized officer of the Company.

    1.2    Compliance with Company Policy.  I agree to comply with all policies, practices and procedures of Connection, as these may be implemented and/or changed by the Company from time to time.  Without limiting the generality of the foregoing, I acknowledge that Connection may from time to time have agreements with other Persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding Intellectual Property, as defined below, created during the course of work under such agreements and/or regarding the confidential nature of such work.  I agree that I will comply with and be bound by all such obligations and restrictions which the Company conveys to me, and that I will take all actions necessary to discharge the obligations of the Company under such agreements.

2. **Confidentiality**

    2.1    Nondisclosure and Nonuse of Confidential Information.  I agree that all Confidential Information, as defined below, which I create or to which I have access as a result of my employment and other associations with the Company is and shall remain the sole and exclusive property of Connection.  I agree that, except as required for the proper performance of my regular duties for the Company, as expressly authorized in writing in advance by the Company, or as required by applicable law, I will never, directly or indirectly, use or disclose any

Confidential Information. I understand and agree that this restriction shall continue to apply after the termination of my employment or this Agreement, howsoever caused. Further, I agree to furnish prompt notice to Connection of any required disclosure of Confidential Information sought pursuant to subpoena, court order or any other legal process or requirement, and agree to provide the Company a reasonable opportunity to seek protection of the Confidential Information prior to any such disclosure.

2.2 <u>Use and Return of Documents</u>. I agree that all documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of Connection and any copies (including without limitation electronic), in whole or in part, thereof (the "Documents" and each individually, a "Document"), whether or not prepared by me, shall be the sole and exclusive property of the Company. Except as required for the proper performance of my regular duties for Connection or as expressly authorized in writing in advance by the Company, I will not copy any Documents or remove any Documents or copies or derivatives thereof from the premises of the Company. I will safeguard, and return to the Company immediately upon termination of my employment, and/or at such other times as may be specified by the Company, all Documents and other property of the Company, and all documents, records and files of its customers, subcontractors, vendors and suppliers ("Third-Party Documents" and each individually a "Third-Party Document"), as well as all other property of such customers, subcontractors, vendors and suppliers, then in my possession or control. Provided, however, if a Document or Third-Party Document is on electronic media, I may, in lieu of surrender of the Document or Third-Party Document, provide a copy on electronic media (*e.g.*, a properly formatted diskette) to the Company and delete and overwrite all other electronic media copies thereof. I further agree that, upon request of any duly authorized officer of Connection, I will disclose all passwords necessary or desirable to enable the Company to obtain access to the Documents and Third-Party Documents.

2.3 <u>Defend Trade Secrets Act of 2016</u>. Under the federal Defend Trade Secrets Act of 2016, I understand that I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to my attorney in relation to a lawsuit for retaliation against me for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

3. **Intellectual Property and Inventions**

3.1 <u>Ownership and Licensing</u>. I shall maintain accurate and complete contemporaneous records of, and shall immediately and fully disclose and deliver to Connection, all Intellectual Property, as defined below. I have attached hereto as <u>Exhibit A</u> a list describing all inventions, original works of authorship,

31405286_2 CONNECTION Non-MA or CA 10.2018

developments, improvements, and trade secrets which were made by me prior or otherwise unrelated to my employment with the Company, which belong to me and which are not assigned to the Company hereunder (collectively referred to as "Prior Inventions"); and, if no such list is attached, I represent and warrant that there are no such Prior Inventions. If, in the course of my employment with the Company, I incorporate into any of the Intellectual Property any Prior Inventions or any other invention, improvement, development, concept, discovery or other proprietary information owned by me or in which I have an interest (collectively, including Prior Inventions, "Employee Inventions"), I hereby grant Connection an irrevocable, worldwide, fully paid-up, royalty-free, non-exclusive license, with the right to sublicense through multiple tiers, to make, use, sell, improve, reproduce, distribute, perform, display, transmit, manipulate in any manner, create derivative works based upon, and otherwise exploit or utilize in any manner the Intellectual Property. All copyrightable works that I create, including without limitation computer programs and documentation, shall be considered "works made for hire" and shall, upon creation, be owned exclusively by Connection.

3.2 <u>Assignment of Rights</u>. I hereby assign and agree in the future to assign to Connection (or as otherwise directed by the Company) my full right, title and interest in and to all Intellectual Property. I further agree to waive and hereby do waive all claims to moral and other rights I may have in any Intellectual Property. I agree to provide, at the Company's request, all further cooperation which the Company determines is necessary or desirable to accomplish the complete transfer of the Intellectual Property and all associated rights to the Company, its successors, assigns and nominees, and to ensure the Company the full enjoyment of the Intellectual Property, including without limitation executing further applications (both domestic and foreign), specifications, oaths, assignments, consents, releases, government communications and other commercially reasonable documentation, responding to corporate diligence inquiries, and providing good faith testimony by affidavit, declaration, and/or deposition, in-person or by other proper means, in support of any effort by the Company to establish, perfect, defend, or otherwise enjoy, in this or any foreign country, its rights acquired pursuant to this Agreement through prosecution of governmental filings, regulatory proceedings, litigation or other means.

To the extent I cannot transfer and assign my entire right, title, and interest to the Intellectual Property, or any portion thereof, then I will assign and transfer all right, title, and interest in and to the Intellectual Property to Connection at the first opportunity to do so. To the extent that I cannot assign and transfer any of my full right, title, and interest in the Intellectual Property, then I hereby grant the Company an irrevocable, worldwide, fully paid-up, royalty-free, exclusive license, with the right to sublicense through multiple tiers, to make, use, sell, improve, reproduce, distribute, perform, display, transmit, manipulate in any manner, create derivative works based upon, and otherwise exploit or utilize in any manner the Intellectual Property. If Connection is unable because of my mental or physical incapacity or for any other reason to secure my signature for any of the assignments, licenses, or other reasonably requested documents

-3-

pertaining to the Intellectual Property referenced in Paragraph 3 hereof within ten days of the delivery of said documents to me, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file said documents and to do all other lawfully permitted acts to further the perfection, defense, and enjoyment of the Company's rights relating to the Intellectual Property with the same legal force and effect as if executed by me. I stipulate and agree that such appointment is a right coupled with an interest, and will survive my incapacity or unavailability at any future time.

I understand and agree that to the extent this Agreement shall be construed in accordance with the laws of any state which precludes a requirement in an agreement such as this to assign to an employer certain classes of inventions developed by an employee, this Paragraph 2(b) shall be interpreted to exclude any invention which a court of competent jurisdiction determines to fall within such classes.

3.3     <u>Delivery of Intellectual Property-Related Information</u>.  I agree that I will assign, deliver and communicate to Connection, its representatives or agents, and its successors and assigns, any know-how, facts and materials arising from or relating to Intellectual Property, including without limitation: (i) all simulations, prototypes, and other embodiments of the Intellectual Property; (ii) all drawings, blueprints, calculations, research plans and results, lab notes, workbooks, software and other records and written materials that relate to the Intellectual Property or that embody or record any know-how pertaining to the Intellectual Property; (iii) all files, documents and communications pertaining to the Intellectual Property; and (iv) evidence for patent interference purposes or for other legal proceedings whenever requested.  I will not charge the Company, its successors or assigns for time spent in complying with my obligations under Paragraphs 3 of this Agreement.

3.4     <u>Original Work</u>.  I hereby represent and warrant that all of the product resulting from my work for the Company will be original and will not infringe the rights of any third party, including without limitation intellectual property rights, such as rights pertaining to patents, trademarks, copyrights and trade secrets.  I further represent that I have not taken, copied or otherwise shared with Connection any confidential or proprietary documents or other material belonging to any former employer or other third party; and I covenant that I will at no time during the course of my employment with the Company use or disclose any confidential or proprietary information belonging to any third party without that party's express consent.

3.5     <u>Waiver and Indemnification</u>.  I agree that I will not, and will not permit anyone acting on my behalf to, assert against the Company, its directors, shareholders, officers, managers, members, joint venturers, employees, representatives or agents (collectively, with the Company, the "Corporate Group") any cause of action, right or claim, of any kind or nature, with respect to the Intellectual

Property or any Employee Inventions, including without limitation Employee Inventions incorporated into the Intellectual Property, and I agree to indemnify and hold harmless the Corporate Group, and each of them, from any and all causes of action, rights or claims, of any kind or nature, losses, damages, costs and expenses, including without limitation attorneys' fees, and any and all other liabilities incurred by any of the Corporate Group arising from or relating to proprietary rights in the Employee Inventions, or any of them, or resulting from my failure to meet any of my obligations under Paragraph 3 of this Agreement.

4.   **Non-Competition and Other Restricted Activity**

4.1   <u>Non-Competition</u>. I agree that the Non-Solicitation and Nondisclosure restrictions in this Agreement will not sufficiently protect the Company's business interests, including but not limited to its trades secrets, confidential information, and good will. Accordingly, I agree that, during my employment and during the 18-month period immediately following the termination of my employment for any reason (the "restricted period"), I will not, directly or indirectly, compete, or undertake any planning to compete, with Connection, whether as an owner, partner, investor, consultant, employee or otherwise. Specifically, but without limiting the foregoing, I agree not to work or provide services, in any capacity, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Person who is engaged in any business that is competitive with the business of the Company, as conducted or in planning during my employment. A competitive business shall, without express or implied limitation, include any Person engaged in the sales, marketing, and/or service of information technology products, computers, and computer networking hardware, software, peripherals and related services (both remote and on-site) through any means, including without express or implied limitation field sales and telephonic and electronic commerce, provided the Person is engaged in such competitive business in one or more of the same geographic territories served by Connection. I further agree, during the restricted period, not to be employed or otherwise engaged by a client or customer of the Company and provide for such client or customer the same or similar technical, computer support or other services which I provided to such client or customer while employed by the Company. I also agree, during the restricted period, not to be employed or otherwise engaged by a supplier, vendor or business partner of the Company, if such supplier, vendor or business partner competes with the Company regarding the sales, marketing, and service of information technology products, computers, and computer networking hardware, software, peripherals and related services to any customer or prospective customer. I understand that the foregoing shall not prevent my passive ownership of one percent (1%) or less of the equity securities of any publicly traded company.

4.2   <u>Good Will</u>. I acknowledge and agree that any and all good will which I develop during my employment with any of the customers, prospective customers, subcontractors or suppliers of Connection shall be the sole, exclusive and

permanent property of the Company, and shall continue to be such after the termination of my employment, howsoever caused.

4.3    Non-Solicitation of Customers.  I agree that, during my employment and during the 18-month period immediately following the termination of my employment for any reason, I will not, directly or indirectly, (a) solicit, encourage or induce any customer of Connection to terminate or diminish its business relationship or patronage with the Company; (b) seek to persuade or induce any such customer or prospective customer of Connection to conduct with anyone else any business or activity which such customer or prospective customer conducts or could conduct with the Company; or (c) accept business from any such customer.  Provided, these restrictions shall apply (y) only with respect to those Persons who are or have been a customer of Connection at any time within the immediately preceding one-year period or whose business has been solicited on behalf of the Company by any of its officers, employees or agents within said one-year period, other than by form letter, blanket mailing or published advertisement, and (z) only if I have performed work for such Person during my employment with the Company or have been introduced to, or otherwise had non-incidental contact with, such Person as a result of my employment  or other associations with the Company or have had access to Confidential Information which would assist in the solicitation of such Person.

4.4    Non-Solicitation/Non-Hiring of Employees and Independent Contractors.  I agree that, during my employment and for the 18-month period immediately following the termination of my employment for any reason, I will not, and will not directly or indirectly assist anyone else to, (a) hire or solicit for hiring any employee of the Company or seek to persuade or induce any employee of the Company to discontinue employment with the Company, or (b) hire or engage any independent contractor providing services to the Company, or solicit, encourage or induce any independent contractor providing services to the Company to terminate or diminish its business relationship with the Company.  For the purposes of this Agreement, an "employee" or "independent contractor" of Connection is any person who is or was such at any time within the preceding six-month period.

4.5    Notice of New Address and Employment.  During the 18-month period immediately following the termination of my employment for any reason, I will notify Connection in writing of any change in my address and of each new job or other business activity in which I plan to engage at least two weeks prior to beginning such job or activity.  Such notice shall state the name and address of any new employer and the nature of my position.  I further agree to provide Connection with any other pertinent information concerning such business activity as the Company may reasonably request in order to determine my continued compliance with my obligations under this Agreement.  I agree to notify my new employer(s) of my obligations under this Agreement, and hereby consent to notification by the Company to my new employer(s) concerning my obligations under this Agreement.

31405286_2 CONNECTION Non-MA or CA  10.2018

4.6     <u>Acknowledgement of Reasonableness; Remedies</u>.  In signing this Agreement, I
        give the Company assurance that I have carefully read and considered all the
        terms and conditions of this Agreement, including the restraints imposed on me
        under this Agreement.  I agree without reservation that each of the restraints
        contained herein is necessary for the reasonable and proper protection of the good
        will, Confidential Information and other legitimate business interests of
        Connection, that each and every one of those restraints is reasonable in respect to
        subject matter, length of time and geographic area; and that these restraints will
        not prevent me from obtaining other suitable employment during the period in
        which I am bound by them.  I agree that I will never assert, or permit to be
        asserted on my behalf, in any forum, any position contrary to the foregoing.  I also
        acknowledge and agree that, were I to breach any of the provisions of this
        Agreement, the harm to the Company would be irreparable.  I therefore agree that,
        in the event of such a breach or threatened breach, the Company shall, in addition
        to any other remedies available to it, have the right to obtain preliminary and
        permanent injunctive relief against any such breach or threatened breach without
        having to post bond, and will additionally be entitled to an award of attorney's
        fees incurred in connection with securing any relief hereunder.  Without limiting
        the generality of the foregoing, I agree that, in the event of my breach of any of
        the provisions of this Agreement, the Company shall have the immediate right to
        terminate any shares of restricted stock and stock options that have been awarded
        to me by the Company, notwithstanding anything to the contrary in any applicable
        grant document, stock option plan, and any other applicable agreements and
        plans.  I further agree that, in the event that any provision of this Agreement shall
        be determined by any court of competent jurisdiction to be unenforceable by
        reason of its being extended over too great a time, too large a geographic area or
        too great a range of activities, such provision shall be deemed to be modified to
        permit its enforcement to the maximum extent permitted by law.  Finally, I agree
        that the periods of restriction set forth in Paragraph 4 of this Agreement shall be
        tolled, and shall not run, during any period of time in which I am in violation of
        the terms thereof, in order that the Company shall have all of the agreed-upon
        temporal protection recited herein.

4.7     <u>Consent to Jurisdiction</u>.  The parties agree that any action or proceeding with
        respect to this Agreement and Employee's employment shall be brought
        exclusively in the state or federal courts in the State of New Hampshire, and I
        voluntarily submit to the exclusive jurisdiction over my person by a court of
        competent jurisdiction located within the State of New Hampshire.   The parties
        hereby irrevocably waive any objection they may now or hereafter have to the
        laying of venue of any such action in the State of New Hampshire, and further
        irrevocably waive any claim they may now or hereafter have that any such action
        brought in said court(s) has been brought in an inconvenient forum.  This
        Agreement is intended to supplement, and not supersede, any remedies or claims
        that may be available to the Company under applicable law, including any claims
        asserting misappropriation of trade secrets or unfair trade practices.  I agree to
        accept service of process by registered or certified mail or the equivalent directed

to my last known address on the books of the Company, or by whatever other means are permitted by such court.

5.    **Exit Interview**

I agree that, at the time my employment ends, I will participate in an exit interview conducted by a designated representative of Connection, and that I will otherwise cooperate with the Company to assure a smooth transition of my duties and responsibilities.  If requested to do so by the Company, either during or after my employment with the Company, I agree to sign a termination certificate in the form attached hereto as Exhibit B, in which I confirm that I have complied with the requirements of this Agreement and that I am aware that certain restrictions imposed upon me by this Agreement continue after the termination of my employment.  I understand, however, that my rights and obligations under this Agreement will continue even if I do not sign a termination certificate.

6.    **Definitions**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings provided in this paragraph and as provided elsewhere in this Agreement. For purposes of this Agreement, the following definitions apply:

"Confidential Information" means any and all information of Connection, whether or not in writing, that is not generally known by others with whom the Company competes or does business, or with whom it plans to compete or do business, and any and all information, which, if disclosed, would assist in competition against the Company, including but not limited to (a) all proprietary information of the Company, including but not limited to the existing and future products and services, technical data, methods, processes, know-how, developments, inventions, and formulae of the Company, (b) the development, research, testing, marketing and financial activities and strategic plans of the Company, (c) the manner in which the Company operates, including information about the experience and quality of its employees and contractors, (d) its costs and sources of supply, (e) the identity and special needs of the customers, prospective customers and subcontractors of the Company, and (f) the people and organizations with whom the Company has business relationships and the substance of those relationships. Without limiting the generality of the foregoing, Confidential Information shall specifically include:  (i) any and all product testing methodologies, product test results, research and development plans and initiatives, marketing research, plans and analyses, strategic business plans and budgets, short and long-range product, sales, marketing, expansion, diversification and similar plans; (ii) any and all vendor, supplier and purchase records, including without limitation the identity of contacts at any vendor, any list of vendors or suppliers, any oral or written agreements, any lists of purchase transactions and/or prices paid; and (iii)  any and all customer lists and customer and sales records, including without limitation the identity of contacts at purchasers, any list of purchasers, and any list of sales transactions and/or prices charged by the Company. Confidential Information also includes any information that the Company may receive or

has received from customers, subcontractors, suppliers or others, with any understanding, express or implied, that the information would not be disclosed.

"Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable, copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by me (whether alone or with others, and whether or not during normal business hours or on or off Company premises) during the period of my employment that relate in any way to the business or products of the Company, or to any prospective activity of the Company, or which make use of the Confidential Information or of facilities or equipment of Connection.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization, other than the Company.

7.      **Compliance with Other Agreements and Obligations**

I represent and warrant that my employment by Connection and the execution and performance of this Agreement will not breach or be in conflict with any other agreement to which I am a party or am bound, and that I am not now subject to any covenants against competition or similar covenants or other obligations to third parties or to any court order, judgment or decree that would affect the performance of my obligations hereunder or my duties and responsibilities to the Company, except as I have disclosed in writing to the Company no later than the time I return an executed copy of this Agreement.

8.      **Entire Agreement; Severability; Modification**

This Agreement sets forth the entire agreement between me and Connection, and supersedes all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the subject matter hereof.  Provided, however, this Agreement shall not terminate or supersede any additional obligations I may have pursuant to any other agreement or under applicable law with respect to confidentiality, non-competition, assignment of rights to intellectual property or the like. In the event of conflict between this Agreement and any prior agreement between me and the Company, this Agreement shall govern.  The provisions of this Agreement are severable, and no breach of any provision of this Agreement by the Company, or any other claimed breach of contract or violation of law, shall operate to excuse my obligation to fulfill the requirements of Paragraphs 3 and 4 hereof.  No deletion, addition, marking, notation or other change to the body of this Agreement shall be of any force or effect, and this Agreement shall be interpreted as if such change had not been made.  This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by me and an expressly authorized officer of Connection.  If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect, it shall not affect any other provisions, and shall be construed by limiting it so as to be enforceable to the maximum extent permissible by

law. Provisions of this Agreement shall survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purpose of other surviving provisions.  It is agreed and understood that no changes to the nature or scope of my employment relationship with Connection shall operate to extinguish my obligations hereunder or require that this Agreement be re-executed.

9.   **Extension of Restrictive Periods**

The restrictive periods set forth in Paragraph 4 of this Agreement shall not expire and shall be tolled during any period in which I am in violation of such restrictions, and therefore such restrictive period shall be extended for a period equal to the duration of my violation thereof.

10.   **Assignment**

Neither Connection nor I may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, the Company may assign its rights and obligations under this Agreement without my consent (a) in the event that I am transferred to a position with one of the Company's affiliates or (b) in the event that the Company shall hereafter effect a reorganization, consolidate with, or merge into any Person or transfer to any Person all or substantially all of the business, properties or assets of the Company or any division or line of business of the Company with which I am at any time associated.  This Agreement shall inure to the benefit of and be binding upon me and the Company, and each of our respective successors, executors, administrators, heirs, representatives and permitted assigns.

11.   **At-Will Employment**

I acknowledge and agree that this Agreement does not in any way obligate Connection to retain my services for a fixed period or at a fixed level of compensation; nor does it in any way restrict my right or that of the Company to terminate my employment at any time, at will, with or without notice or cause.

12.   **Successors**

I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company, and any successor or permitted assign to whose employ I may be transferred, without the necessity that this Agreement be re-signed at the time of such transfer.

13.   **Choice of Law**

This is a New Hampshire contract and shall be governed by and construed in accordance with the laws of the State of New Hampshire, without regard to the conflict of laws principles thereof.

31405286_2 CONNECTION Non-MA or CA  10.2018

14. **Acknowledgement of Understanding**

In signing this Agreement, I give the Company assurance that I have read and understood all of its terms; that I have had a full and reasonable opportunity to consider its terms and to consult with any person of my choosing before signing; that I have not relied on any agreements or representations, express or implied, that are not set forth expressly in this Agreement; and that I have signed this Agreement knowingly and voluntarily.

Intending to be legally bound hereby, I have signed this Agreement under seal as of the day and year written below.

Signature: _____

Printed Name: _____Peter Sillich_____

Date: _____8/1/20_____

EXHIBIT A

LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| TITLE | DATE | IDENTIFYING NUMBER OR BRIEF DESCRIPTION |
|---|---|---|

___X___ No inventions or improvements

_____ Additional sheets attached

Signature of Employee: _____
                        Full Name

Date: ___08/03/2020___

EXHIBIT B

TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blue-prints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items, including without limitation any such items in electronic form, belonging to PC Connection, Inc., d/b/a Connection, its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's Employee Agreement signed by me (the "Agreement"), including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that Agreement.

I further agree that, in compliance with the Agreement, I will preserve as confidential all Confidential Information (as defined therein), including, without limitation, trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matters pertaining to any business of the Company or any of its employees, customers, consultants or licenses.

I further agree that I will comply with the restrictions imposed by Paragraphs 3 and 4 of the Agreement.

Date: _____

        __FOR EXAMPLE ONLY__
        Employee

(Termination Certificate)

# EXHIBIT F

**From:** Peter Sillich <psillich@partneroneit.com>
**Sent:** Wednesday, September 28, 2022 6:07 PM
**To:** Albino, Kathleen P. <kalbino@hinckleyallen.com>
**Cc:** Zaccardelli, Lisa A. <lzaccardelli@hinckleyallen.com>
**Subject:** RE: Obligations to Connection

[EXTERNAL EMAIL]

Hi Kathleen,

I am under no obligation with Connection.

Frank Conforti the sales Director and my old sales manager Peg Murphy both said on a call with me that I wasn't a good fit for the organization and that they would find a way to push me out. This was solely due to the fact that I didn't attend their summer barbeques and didn't kiss their ass like they wanted me to. (Connection always played favorites with ass kissers). Weeks later I ran into an issue with another account manager telling me what to do so I scheduled a call with HR to discuss.

Upon joining the meeting HR took over the call and didn't give me a chance to talk about the altercation, instead they fired me for "misconduct" due to the fact I wasn't following the "rules of engagement". These were made up rules just

for me and no other rep had to abide by them... It also wasn't in writing anywhere and no other reps knew of these "said rules".

This was also very odd because I received a 450k po that same day.. They stole the business that I uncovered and worked so hard to close. I also won the President's trip and was going to Aruba next month, but they also took that away from me and the 4k in referral bonuses they owed me. Firing me the day I received that large po and taking advantage of the two employees that I referred that got hired is nothing short of shady.

After being out of work for a week or two my customers called me and expressed their dissatisfaction with their new Connection rep and how unresponsive they were. My customers asked me what to do since they told me they no longer wanted to work with Connection. I told them I wasn't working but I referred them to Partner One IT and told them they would receive the same service I was able to offer. Connection pushed me out then fired me so the non-compete is now voided. It's funny my customers placed orders with Partner 1 even before I started which shows they really didn't want to work with Connection. At the end of the day it's up to my customers where they want to procure their IT hardware and software.. If they bought gear from P1 prior to my starting date, I cant help that. It's a free market world, businesses will buy from where they would like to. Coincidentally enough I started with Partner One just last week 09/22/2022.

I feel sorry that you go after young hard-working men. I deserve a right to earn a living and it's unfortunate you are supporting such a shady corporation. I would suggest reading glass door reviews and seeing the negative reviews. Connection has lost 10 Presidential account managers and over 70 account reps due to poor management, lack of growth potential, HR wrongfully terminating reps, etc. If that doesn't say anything I don't know what would.

**Peter Sillich**
Senior Executive Account Manager
Direct line: 603-440-4234
Home - PartnerOneIT



---

**From:** Albino, Kathleen P. <kalbino@hinckleyallen.com>
**Sent:** Wednesday, September 28, 2022 2:59 PM
**To:** Peter Sillich <psillich@partneroneit.com>
**Cc:** Zaccardelli, Lisa A. <lzaccardelli@hinckleyallen.com>
**Subject:** Obligations to Connection

Mr. Sillich:

Please find attached correspondence from Attorney Lisa Zaccardelli on behalf of Connection.

Best regards,
Kathleen Albino

**Kathleen P. Albino**
Legal Assistant

Hinckley Allen
20 Church Street
Hartford, CT 06103-1221
p: 860-331-2834 | f: 860-278-3802
kalbino@hinckleyallen.com

**Comer, Susan M.**

| | |
|---|---|
| **From:** | NHCourtsno-reply@efilingmail.tylertech.cloud |
| **Sent:** | Wednesday, November 2, 2022 5:47 AM |
| **To:** | Comer, Susan M. |
| **Subject:** | Filing Accepted for Case: 216-2022-CV-00728;  PC Connection, Inc. v Peter Sillich; Envelope Number:  2652128 |

[EXTERNAL EMAIL]



# Filing Accepted

Envelope Number: 2652128
Case Number: 216-2022-CV-00728
Case Style: PC Connection, Inc. v Peter Sillich

The filing below was reviewed and has been accepted by the clerk's office. You may access the file stamped copy of the document filed by clicking on the below link.

| Filing Details | |
|---|---|
| **Court** | Superior Courts |
| **Case Number** | 216-2022-CV-00728 |
| **Case Style** | PC Connection, Inc. v Peter Sillich |
| **Date/Time Submitted** | 11/1/2022 4:59 PM EST |
| **Date/Time Accepted** | 11/2/2022 5:46 AM EST |
| **Accepted Comments** | |
| **Filing Type** | EFileAndServe |
| **Filing Description** | SEALED |
| **Activity Requested** | Complaint - Civil |
| **Filed By** | Susan Comer |
| **Filing Attorney** | Christopher Carter |

| Document Details | |
|---|---|
| **Lead Document** | Verified Complaint for Preliminary and Permanent Injunctive Relief and Damages - 11.1.22.pdf |
| **Lead Document Page Count** | 84 |
| **File Stamped Copy** | [Download Document](#) |
| **This link is active for 180 days.** | |

If the link above is not accessible, copy this URL into your browser's address bar to view the document:
https://newhampshire.tylertech.cloud/ViewDocuments.aspx?FID=5cf51913-9332-443b-a035-a0609396b0de

**Important:** This is how you will be contacted regarding cases. Please add NHCourtsno-reply@efilingmail.tylertech.cloud in your address book.

For further assistance, please contact the court.
1-855-212-1234
This message was automatically generated. Please do not reply to this email.